CROWN WILLAMETTE PAPER CO. *v.* UNITED STATES (No. 2946)[1]

United States Court of Customs Appeals, January 9, 1929

*Frank L. Lawrence* (*Martin T. Baldwin* of counsel) for appellant.
*Charles D. Lawrence,* Assistant Attorney General (*Fred J. Carter,* special attorney, of counsel), for the United States.

[Oral argument October 2, 1928, by Mr. Carter]

Before GRAHAM, Presiding Judge, and BLAND and HATFIELD, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The appellant appealed to this court from a judgment of the United States Customs Court which overruled the protest and approved the classification by the collector of certain paper as dutiable under paragraph 1301 of the Tariff Act of 1922. In the protest it was claimed by appellant that the merchandise was free as "standard newsprint

[1] T. D. 43187.

paper" under paragraph 1672 of said act. The pertinent parts of the provisions of the statute under consideration are as follows:

PAR. 1301. Printing paper, not specially provided for, one-fourth of 1 cent per pound and 10 per centum ad valorem: * * *.

PAR. 1672. Standard newsprint paper.

The importation consisted of rolls of paper $10\frac{7}{8}$ and 12 inches wide and also the same grade of paper 9 inches long by 6 inches wide, in sheets. There were several protests, all involving the same question. The appraiser's answers to the protests were all substantially in the same language except as to the dimensions of the paper. The following answer by the appraiser to one of the protests is typical:

The merchandise covered by this protest is described upon the invoice as newsprint paper, 12 inches. It is what is known as a side run. It is of the same character and quality as that used for the printing of newspapers, but being only 12 inches wide is not suitable for such purpose. Therefore, it does not come within the description of paragraph 1672 as standard newsprint paper. Reference is made to T. D. 39778 and T. D. 39860. * * *

There is no dispute about the grade or quality of the paper, how it is made, nor for what purpose it is used. The importation is known as side runs cut from standard newsprint paper. The evidence shows that the imported paper is produced in Canada on large machines, in continuous lengths, and in widths of 192 inches, after trimming. This paper is then cut into serviceable widths, shipped in large rolls, and is used almost exclusively for printing newspapers. On account of the orders which the manufacturers receive, being for paper of different widths, the cutting of the sheets produces side runs, in the form of rolls, less than $16\frac{1}{2}$ inches wide, which are too narrow for newspaper purposes. It is conceded that no newspaper in the United States is printed on paper less than $16\frac{1}{2}$ inches wide. The importation is used in this country for the printing of pencil tablets, small circulars, wrapping paper, sales books and pads, duplicate bills of lading, and other manufactures of low-grade paper.

At the trial below an attempt was made to prove that the importation was known in the trade as "standard newsprint paper." The court below found that commercial designation had not been proved, and both sides concede here that the court's finding that commercial designation had not been proved was correct.

The only question before us is, are the side runs "standard newsprint paper" and free of duty under paragraph 1672? It is the contention of importer that the term "standard newsprint paper" has reference to a certain grade and quality of paper, regardless of its use, width, or other dimensions, and that since the side runs are of the same character and quality as standard newsprint paper, which is used chiefly for printing newspapers, they should have the same tariff treatment, and that the width and size of the paper were not considered

by Congress when it used the word "standard," since newsprint paper, admittedly standard, of varying widths, is used in the printing of newspapers. The Government urges that the term used and the circumstances surrounding its use by Congress show that it was the legislative intent to include within the free-list paragraph, under the term "standard newsprint paper," only such paper as was ordinarily and generally used by newspaper publishers in printing their regular editions.

The meaning of the three words used, "standard newsprint paper," when considered separately, is not doubtful, but when used together and in the manner in which they are used, and when considered in the light of the past history of paper legislation and the circumstances surrounding their enactment, the meaning of the term is involved in considerable doubt and ambiguity.

The Century Dictionary and Cyclopedia defines the word "standard" as follows:

1. A weight, measure, or instrument by comparison with which the accuracy of others is determined.

   *      *      *      *      *      *      *

3. That which is set up as a unit of reference; a form, type, example, instance, or combination of conditions accepted as correct and perfect, and hence as a basis of comparison; a criterion established by custom, public opinion, or general consent; a model.

The word "newsprint" is not defined in the main vocabularies of the dictionaries, but we find the words "news," "newspaper," and "newssheet" defined, and their definitions are somewhat illuminating. One of the definitions of "news" and "newssheet" in Funk & Wagnalls New Standard Dictionary is "a newspaper." The same authority defines "newspaper" as follows:

2. The thin, unsized paper on which the ordinary daily is printed; when unqualified, usually implies that it has been printed upon. *Newsprint.* (Italics ours.)

In the addenda to Webster's New International Dictionary, published in 1925, "newsprint" is defined as follows:

A kind of thin machine-finished paper made from mechanical wood pulp, with an admixture of chemical wood pulp, and used largely for newspapers; called also print.

In the Summary of Tariff Information (1921) under the head, "Important changes in classification" (referring to paper), is found the following:

*Important changes in classification.*—The distinction made previously between the two kinds of printing paper on the basis of value per pound has been dropped. Newsprint paper is specifically provided for as "standard newsprint paper" (par. 1659). Printing paper other than standard newsprint, which includes not only book paper (except the coated and cover grades which are provided for

in other paragraphs) but also grades of newsprint other than standard newsprint paper, takes the place of printing paper valued above the maximum value per pound specified for newsprint.

' The reason for the change is that the value distinction between newsprint and book paper is now unsatisfactory because of the markedly fluctuating prices of printing paper. The term "standard newsprint paper" is the commercial term for the principal subdivision of newsprint paper, being paper weighing 32 pounds per ream, used for printing newspapers. It constitutes more than nine-tenths of the total output of newsprint paper in this country. It applies to practically all the newsprint shipments from Canada to the United States. The use of this term furthermore disposes of complaints that because of the present 8-cent maximum free limit on printing paper, some cheap grades of book paper are allowed to enter this country free (pp. 1046–1047).

Congress had before it, when it prepared the Tariff Act of 1922, "Tariff Information Surveys," which was information on various subjects submitted by the United States Tariff Commission. We quote from pages 7 and 10 of one of such pamphlets on the subject of "Printing Paper":

There are two kinds of printing paper—newsprint and book paper. Newsprint is a cheap grade containing on the average from 75 to 80 per centum ground wood and the remainder sulphite pulp. It is used for printing newspapers and for various minor purposes. Book paper is a superior grade, made principally of sulphite and soda pulp, but also often containing rag pulp. It is used mainly for printing books and magazines. There are various intermediate grades between newsprint and book paper; the line of division between the two varieties is, hence, not distinct. The 1920 act distinguishes between them on the basis of value. It divides printing paper into two classes, that valued at not above 8 cents per pound and that valued above 8 cents per pound. The former, newsprint, enters free; the latter, book paper, at a 12 per centum ad valorem duty.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Newsprint.—Newsprint paper, as the name implies, is used mainly for printing newspapers. Minor uses are for cheap magazines, books, catalogues, telephone directories, railway guides, school tablets, handbills, etc. Some so-called newsprint is used as a cheap grade of wrapping paper. Newsprint is cheaper, tears more easily, and is less durable than book paper. Standard newsprint, which comprises about 90 per centum of all newsprint, contains usually from 75 to 80 per centum of ground wood pulp and from 20 to 25 per centum of sulphite pulp, which is a chemically prepared pulp of superior grade to and more expensive than ground wood pulp. Between standard newsprint and book paper there are various grades of newsprint containing a greater percentage of sulphite pulp, such as halftone news, special news, novel news, catalogue news, etc.

Mr. Fordney, for the Committee on Ways and Means, in his report on Schedule 13, H. R. 7456, which bill became the Tariff Act of 1922, said:

The paper schedule removes from the dutiable list wood pulp of all kinds and standard newsprint. The designation of standard newsprint is a new term, but thoroughly understood both in the trade and in the customs office. It is that form of print paper upon which newspapers are printed. The American consumption both of pulp and standard newsprint is greatly in excess of our production. It is therefore logical, in the interests of conservation and suitable supply,

that these articles should be upon the free list. Sufficient authority is given the President to protect American interests should any discrimination be shown against us by foreign nations. (Italics ours.)

We find in the report of the Senate committee on the same bill, reported by Mr. McCumber, the following:

Your committee has adopted the policy of the House bill in recommending the free entry of mechanical wood pulp and standard newsprint paper.

The Government, in its brief, says:

It is a matter of common knowledge that for many years publishers of newspapers in the United States have agitated cheap paper for printing the regular editions of their newspapers. They were furnishing the newspapers to the public at minimum rates and demanded that they be able to secure paper used in printing those editions at minimum prices.

Regardless of whether this court can take judicial knowledge of those facts in the consideration of this case, we think the hearings before the committees of Congress, during the last 20 years, abundantly support the statement.

In consideration of all the facts, we think it is reasonable to conclude that Congress intended to free-list that class of paper upon which newspapers are printed. The report of the House Committee on Ways and Means would indicate that they wished to narrow the meaning of the word "newsprint" by limiting the provision to only such newsprint as was standard. The report states that "the designation of standard newsprint is a new term, but thoroughly understood both in the trade and in the customs office."

The testimony in this case supports the conclusion that "standard newsprint paper" is only such paper as is chiefly used for printing newspapers. The testimony is in conflict as to whether the side runs, cut from paper which is admittedly standard newsprint paper, are regarded as standard newsprint paper, but there is no conflict in the testimony but what the large sheets from which the rolls were cut were in fact standard newsprint paper. On account of its dimensions, the importation was not susceptible of a use for newspaper printing. The context of the paper paragraphs in the Tariff Act of 1922 and other acts, together with the history of the whole situation, indicates that Congress, when using the term "standard newsprint paper," did not contemplate the free admission of paper which could not be used for the purpose of newspaper printing. The report of the House committee shows that the paper which is intended to be free was that *form* of print paper upon which newspapers are printed. Evidently, the weight, thickness, and composition of the paper were not the only characteristics Congress had in mind when the term "standard newsprint paper" was used.

When the Congress has clearly indicated the purpose and expected resulting effect of a tariff provision, customs officials and the courts, on construing the same, will so apply and so construe it as to bring

about such purposes, unless the language used is such as to render a contrary result unavoidable. In *United States v. Stone & Downer Co. et al.*, 274 U. S. 225, 244, the learned chief justice, in speaking for the court, said:

If the language of the statute is such that such results can not be avoided, of course it must be enforced accordingly. If Congress by its language has made a mistake, and so has failed in its purpose, this court can not supply by its decision the omission of a necessary legislative provision to effect its purpose. With the intent of the act clearly in mind, however, we must see whether it is true that the language used can only bear the construction insisted upon by the importers and upheld by the Court of Customs Appeals, or whether there is a broader and more reasonable construction that can be fairly placed upon the statute which will serve the plain congressional purpose.

It being admitted that newspapers are not printed on and can not be printed on the imported merchandise, it follows that it is not "standard newsprint paper" and was properly classified by the collector.

The judgment of the United States Customs Court is *affirmed*.