The judgment of the United States Customs Court is *affirmed*.

UNITED STATES *v.* JAMES P. HEFFERNAN PAPER Co. (No. 3145)[1]

United States Court of Customs and Patent Appeals, April 29, 1929

*Charles D. Lawrence*, Assistant Attorney General (*Fred J. Carter*, special attorney, of counsel), for the United States.

*Olvany, Eisner & Donnelly* for appellee.

*Elisha Hanson, amicus curiae.*

62

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, and GARRETT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Certain paper, sold in Austria and imported at the port of New York, was assessed for duty by the collector at the rates shown in the appraiser's answer to the protest, which is as follows:

> The merchandise is described as printing paper and consists of printing paper which, in the opinion of this office, is not made in accordance with the requirements of T. D. 39778 and T. D. 39860. It was accordingly returned for duty as printing paper, at ¼ cent per lb. and 10% ad val. under par. 1301, Act of 1922.

Importer protested the classification, claiming the merchandise to be free of duty as "standard newsprint paper" under paragraph 1672, Tariff Act of 1922. It was alternatively claimed that if the merchandise was dutiable it was dutiable at 10 or 20 per centum ad valorem under the nonenumerated-article paragraph 1459. The protest was directed against certain portions of the shipment which was represented by "Protest schedule and schedule 'A'," annexed to and made a part of the decision of the court below.

In the court below, as here, the sole question is declared to be, by all parties concerned: "Do the papers under consideration consist of standard newsprint paper in the tariff sense of that term?" No question is raised as to the proper classification by the collector, if the papers are not standard newsprint paper. The record contains more than 220 pages of testimony. There are 18 exhibits and many illustrative exhibits.

The court below, following *Myers* v. *United States*, 50 Treas. Dec. 370, T. D. 41827, sustained the protest as to the items enumerated in said schedule marked "A" and in all other respects overruled the protest.

At the time the case was tried in the court below, this court had not handed down the decision in the case of *Crown Willamette Paper Co.* v. *United States*, 16 Ct. Cust. Appls. 431, T. D. 43187.

The Government has appealed to this court and here contends that the term "standard newsprint paper," as used in paragraph 1672, means paper of the kind, quality, and size ordinarily and generally used by newspapers in printing their regular editions, and that paper which is susceptible of such use by some newspaper publishers, but which is chiefly used for other purposes, is not the "standard newsprint paper" of the statute.

The importer admitted in this court that no attempt was made in the court below to prove that the paper in question was chiefly used for printing newspapers. Appellee, evidently, proposed only to show that some, if not all, of the paper in question was susceptible of a newspaper printing use. The testimony of the importer's witnesses.

is characterized by such statements as "it could be used for printing newspapers"; "it has been used to print newspapers"; "I have seen newspapers printed on this kind of paper"; "Many weekly newspapers are printed on this kind of paper"; and so forth.

The record shows that the paper is used for box and trunk linings, pen and ink tablets, cheap writing paper, catalogues, order blanks, and general job printing, such as posters, handbills, circulars, and dodgers, and the Government contends that the record shows that this is its chief use. A number of the exhibits are colored.

The evidence fairly shows that some of the papers can be used and are sometimes used by small newspapers and weekly newspapers who use flat-bed presses which operate slowly and that such use is made possible owing to the slow operation of the press which permits the ink to absorb slowly, thereby avoiding blotting. Some of the papers in controversy, being hard surfaced, do not absorb ink readily and have a "tinny" or more or less glazed surface, and are suitable for photogravure and other similar work, as well as for job work, where opportunity for the drying of the ink is afforded.

The record discloses that there are 14,000 weekly newspapers and 2,200 daily newspapers printed in the United States; that the weekly newspapers and small newspapers are, for the most part, printed from sheets and not from rolls; that flat presses use sheets and that rotary presses use rolls; that there are some rotary presses with slow motion which can use a grade of paper similar to some of the contested exhibits; that in fast-moving rotary presses, the paper must be strong and in rolls of certain size, and that the strength or tearing quality of the paper is more or less dependent upon the relative component parts of ground wood and sulphite.

The Treasury Department, in T. D. 40996, 47 Treas. Dec. 844, set out the departmental definition of standard newsprint paper as follows:

The term "standard newsprint paper" as used in paragraph 1672 of the Tariff Act of 1922 shall conform to the following specifications:

*Weight.*—500 sheets, each 24 by 36 inches, shall weigh not less than 30 pounds nor more than 35 pounds.

*Rolls.*—The paper shall be in rolls not less than 16 inches wide and 28 inches in diameter. Sheets 20 by 30 inches.

*Stock.*—Not less than 70 per cent of the total fiber shall be ground wood; the remainder shall be unbleached sulphite.

*Finish.*—The average of 5 tests in machine direction and 5 tests in cross direction on both sides, moving the paper after each test, made with the Ingersoll glarimeter, shall be not more than 50 per cent gloss.

*Ash.*—Shall be not more than 2 per cent.

*Degree of sizing.*—Time of transudation of water shall be not more than 10 seconds by the ground-glass method or 5 seconds by the alternate methods.

Importer earnestly contends that this regulation, or its predecessors, when applied to the classification of paper like that in controversy, as was done by the collector in the case at bar, makes dutiable the

newsprint used by the country newspaper, and free lists the paper used by the great metropolitan newspapers, which, it contends, was manifestly not within the intent of the legislature.

The Government seeks to uphold the definition set out by the Treasury Department on the theory (if we correctly understand its brief) that the regulation made pursuant to the authority granted in the act for carrying out the provisions of the same, accurately provides a means of determining, at the port of entry, whether the importation is, in fact, standard newsprint paper or some other kind of paper. It points out that customs officers do not have the facilities for placing printing paper upon the press to determine its actual printing qualities, but that by tests carefully made by the Bureau of Standards and elsewhere, it has been ascertained that the specifications set out in T. D. 40996, when applied to imported paper, will definitely determine its character.

The importer argues, and to this extent is supported by *amicus curiæ;* The American Newspaper Publishers Association, represented by Elisha Hanson, attorney, that T. D. 40996 goes further than the law warrants and nullifies the law; that it sets up a standard not warranted by the wording of the act and which, in effect, is legislation.

In *Crown Willamette Paper Co.* v. *United States, supra,* we had before us rolls of paper 10⅞ inches and 12 inches wide, and also the same grade of paper 9 inches long by 6 inches wide, in sheets. These papers were cut from large widths of standard newsprint paper and were known as "side runs." The paper could not be used and was not used for newspaper printing on account of its size, since no newspaper in the United States, according to the testimony, is printed on paper less than 16½ inches wide. The record in that case showed that the paper was used for the printing of pencil tablets, small circulars, wrapping paper, sales books and pads, duplicate bills of lading, and other manufactures of low-grade paper. The only question there, as here, was: Is the importation standard newsprint paper? We there said:

Congress had before it, when it prepared the Tariff Act of 1922, "Tariff Information Surveys," which was information on various subjects submitted by the United States Tariff Commission. We quote from pages 7 and 10 of one of such pamphlets on the subject of "printing paper":

There are two kinds of printing paper—newsprint and book paper. Newsprint is a cheap grade containing on the average from 75 to 80 per centum ground wood and the remainder sulphite pulp. It is used for printing newspapers and for various minor purposes. Book paper is a superior grade, made principally of sulphite and soda pulp, but also often containing rag pulp. It is used mainly for printing books and magazines. There are various intermediate grades between newsprint and book paper; the line of division between the two varieties is, hence, not distinct. The 1920 Act distinguishes between them on the basis of value. It divides printing paper into two classes, that valued at not above 8 cents per pound and that valued above 8 cents per pound. The former, newsprint, enters free; the latter, book paper, at a 12 per centum ad valorem duty.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

*Newsprint.*—Newsprint paper, as the name implies, is used mainly for printing newspapers. Minor uses are for cheap magazines, books, catalogues, telephone directories, railway guides, school tablets, handbills, etc. Some so-called newsprint is used as a cheap grade of wrapping paper. Newsprint is cheaper, tears more easily, and is less durable than book paper. Standard newsprint, which comprises about 90 per centum of all newsprint, contains usually from 75 to 80 per cent of ground wood pulp and from 20 to 25 per cent of sulphite pulp, which is a chemically prepared pulp of superior grade to and more expensive than ground wood pulp. Between standard newsprint and book paper there are various grades of newsprint containing a greater percentage of sulphite pulp, such as halftone news, special news, novel news, catalogue news, etc.

Mr. Fordney, for the Committee on Ways and Means, in his report on Schedule 13, H. R. 7456, which bill became the Tariff Act of 1922, said:

The paper schedule removes from the dutiable list wood pulp of all kinds and standard newsprint. The designation of standard newsprint is a new term, but thoroughly understood both in the trade and in the customs office. *It is that form of print paper upon which newspapers are printed.* The American consumption both of pulp and standard newsprint is greatly in excess of our production. It is therefore logical, in the interests of conservation and suitable supply, that these articles should be upon the free list. Sufficient authority is given the President to protect American interests should any discrimination be shown against us by foreign nations. (Italics ours.)

We find in the report of the Senate committee on the same bill, reported by Mr. McCumber, the following:

Your committee has adopted the policy of the House bill in recommending the free entry of mechanical wood pulp and standard newsprint paper.

The Government, in its brief, says:

It is a matter of common knowledge that for many years publishers of newspapers in the United States have agitated cheap paper for printing the regular editions of their newspapers. They were furnishing the newspapers to the public at minimum rates and demanded that they be able to secure paper used in printing those editions at minimum prices.

Regardless of whether this court can take judicial knowledge of those facts in the consideration of this case, we think the hearings before the committees of Congress during the last 20 years abundantly support the statement.

In consideration of all the facts, we think it is reasonable to conclude that Congress intended to free list that class of paper upon which newspapers are printed. The report of the House Committee on Ways and Means would indicate that they wished to narrow the meaning of the word "newsprint" by limiting the provision to only such newsprint as was standard. The report states that "the designation of standard newsprint is a new term, but thoroughly understood both in the trade and in the customs office."

The testimony in this case supports the conclusion that "standard newsprint paper" is only such paper as is chiefly used for printing newspapers. The testimony is in conflict as to whether the side runs, cut from paper which is admittedly standard newsprint paper, are regarded as standard newsprint paper, but there is no conflict in the testimony but what the large sheets from which the rolls were cut were in fact standard newsprint paper. On account of its dimensions, the importation was not susceptible of a use for newspaper printing. The context of the paper paragraphs in the Tariff Act of 1922 and other acts, together with the history of the whole situation, indicates that Congress, when using the term "standard newsprint paper," did not contemplate the free admission of paper which could not be used for the purpose of newspaper printing. The report of the House committee shows that the paper which is intended to be free was that *form* of print paper upon which newspapers are printed. Evidently, the weight, thickness, and composition of the paper were not the only characteristics Congress had in mind when the term "standard newsprint paper" was used.

Importer's counsel point to the statement in *Crown Willamette Paper Co.* v. *United States, supra:* "On account of its dimensions, the importation was not susceptible of a use for newspaper printing" and urge that by inference, if the paper had been susceptible of use for printing a newspaper, it would have been held to have been standard newsprint paper. The decision, if all its language is considered, clearly refutes this viewpoint. Of course, if the paper was not susceptible of use, it was not used and therefore, obviously, was not chiefly used. The opinion states, however, that "the testimony in this case supports the conclusion that 'standard newsprint paper' is only such paper as is chiefly used for printing newspapers."

One of the reasons which brought the court to its conclusion in the *Crown Willamette Paper Co.* case, *supra*, was the consideration given to the statement of Mr. Fordney and the tariff information furnished to the Ways and Means Committee at the time the bill was being prepared. The legislative intent, as indicated by this phase of the history of the legislation, is not in harmony with appellee's position. It is not reasonable, under all the circumstances, to conclude that the legislature intended that any kind of paper which was susceptible of use or was to any extent used for printing newspapers should be free of duty.

Newspapers, in times of stress, have been printed on wall paper and various other kinds of paper, used chiefly for other purposes, and which were, in fact, little suited for newspaper printing purposes. To accept the importer's contention that any kind of paper upon which a newspaper has been printed or could be printed must be regarded as standard newsprint paper is to apply the doctrine of *susceptibility of use* to the language used by Congress, the result of which would be contrary to what we think Congress intended.

The court below applied the test of *suitability for use*. In view of the history of the printing paper paragraphs of the last half century we think this action is erroneous. The term "printing paper" was ordinarily used in most tariff enactments, and in a number of them, including the acts of April 23, 1920, September 8, 1916, October 3, 1913, August 5, 1909, July 24, 1897, August 27, 1894, and October 1, 1890, we find the words "printing paper * * * *suitable* for the printing of books and newspapers." (Italics not quoted.) In all those acts *suitability* was expressly made the test. In the Act of 1922, however, Congress used new language in describing the paper which it intended to admit free of duty, to wit, "Standard newsprint paper." The suitability test, however, was abandoned and a term was used making use the test.

In applying the doctrine of use, courts have frequently said that a fugitive use, an occasional use, a possible use, or a susceptibility for use is not sufficient, but that chief use should be the test, unless the

legislative intent was shown to be otherwise. To hold otherwise would lead to hopeless confusion in the application of the doctrine of use. *United States* v. *Bloch & Co.*, 13 Ct. Cust. Appls. 5, T. D. 40847; *United States* v. *Paul G. Downing et al.*, 16 Ct. Cust. Appls. 556, T. D. 43294.

Now, if country newspapers with flat-bed presses use the paper in controversy, and this is the chief use of the paper, we can not see why it is not standard newsprint paper, and; therefore, free of duty. On the contrary, if such papers are printed on poster paper, book paper, or any other kind of paper which is chiefly used for other purposes, obviously Congress had not intended, by the use of the words "standard newsprint paper" to include it within the term.

As to the validity of, or the force and effect to be given to, T. D. 40996, under this record, we need say no more than that if it would tend to prevent the free entry of a grade of printing paper chiefly used for printing newspapers to that extent it would be invalid. No one will contend that the Secretary of the Treasury has any authority to legislate. *United States* v. *Monroe-Goldkamp Co.*, 15 Ct. Cust. Appls. 26, T. D. 42135. If, however, for the purpose of carrying out the provisions of the act, he has provided proper tests and standards for quickly determining what standard newsprint paper is, we can see where it would be helpful to the customs officials in classification. But, such regulations must not extend or limit the provisions of the statute contrary to the intent of the legislature. It seems to us that the question as to whether imported paper is standard newsprint paper, under the rule laid down by this court, is a question which is susceptible of proof.

Under the admitted facts in this case, the importation in controversy was not shown to have been chiefly used for the printing of newspapers, and the collector's classification of the paper was not shown to have been incorrect.

That portion of the judgment of the United States Customs Court which sustained importer's protest is *reversed* and in all other respects it is *affirmed*. *Modified*.