(C. D. 1729)

The Tribune Publishing Company *v.* United States

United States Customs Court, Second Division

(Decided October 20, 1955)

*Lawrence & Tuttle* (*George R. Tuttle* of counsel) for the plaintiff.
*Geo. Stephen Leonard*, Acting Assistant Attorney General (*Mollie Strum* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.
*Robert E. Canfield* as *amicus curiae*.

Before Lawrence, Rao, and Ford, Judges; Lawrence, J., not participating

Rao, Judge: We are here concerned with the question of the proper classification within the provisions of the Tariff Act of 1930 of an importation of 801 reels of printing paper invoiced as "Standard White Newsprinting Paper." The collector of customs at the port of San Francisco, Calif., assessed duty upon this merchandise at the rate of 5 per centum ad valorem, plus one-fifth of 1 cent per pound, as uncoated printing paper, not specially provided for, pursuant to the provisions of paragraph 1401 of said act, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802. It is claimed by plaintiff that this action was in error and that the subject paper should have been granted free entry by reason of the provision in paragraph 1772 of said act for standard newsprint paper.

The competing provisions of the Tariff Act of 1930 read as follows:
Paragraph 1401, as modified by T. D. 51802:

Uncoated papers commonly or commercially known as book paper, and all uncoated printing paper, not specially provided for, not including cover paper, ⅛¢ per lb. and 5% ad val.

Paragraph 1772:[1]

Standard newsprint paper.

It appears from this record and the laboratory report, which is in evidence as plaintiff's exhibit 1, that the instant paper conforms to all the specifications for standard newsprint paper, except as to thickness, the same having been reported as 0.0047 of an inch. The specific finding of thickness, as shown by the chemist's report, is not here disputed. It is the contention of the plaintiff that, notwithstanding this finding, the paper at bar is standard newsprint paper within the meaning and intent of that term, as used in paragraph 1772 of the Tariff Act of 1930, *supra*. For the Government, it is argued that paper with a thickness exceeding 0.004 of an inch did not belong to that class, kind, or character of paper which, at and prior to June 17, 1930, was chiefly used for printing newspapers, and that, therefore, the paper at bar is not standard newsprint paper.

The question of what constitutes standard newsprint paper and the intention of Congress in employing that phrase in both the Tariff Act of 1922 (paragraph 1672) and the present law (paragraph 1772, *supra*) is not new to customs jurisprudence. Our appellate court has several times construed this language in determining the appropriate classification of importations of uncoated printing paper claimed to be entitled to free entry as standard newsprint paper. See *Crown Willamette Paper Co.* v. *United States*, 16 Ct. Cust. Appls. 431, T. D. 43187; *United States* v. *James P. Heffernan Paper Co.*, 17 C. C. P. A. (Customs) 61, T. D. 43358; *United States* v. *F. W. Myers & Co., Inc.*, 24 C. C. P. A. (Customs) 464, T. D. 48913; and *United States* v. *C. J. Tower & Sons*, 26 C. C. P. A. (Customs) 1, T. D. 49534.

In its most recent decision on this subject (*United States* v. *C. J. Tower & Sons, supra*), the Court of Customs and Patent Appeals had this to say:

Before discussing the *Whelan* case, *supra* [*United States* v. *F. S. Whelan*, 22 C. C. P. A. (Customs) 426, T. D. 47424], and other cases involved, we think it important to state the main question for determination here. It is: Was appellee required to establish that paper such as is here involved, or paper of the class to which the involved paper belonged, was chiefly used for printing newspapers on or prior to June 17, 1930? At the outset we answer that question in the affirmative. *Goldsmith's Sons* v. *United States*, 13 Ct. Cust. Appls. 69, T. D. 40932; *Wilbur-Ellis Co. et al.* v. *United States*, 18 C. C. P. A. (Customs) 472, T. D. 44762. The query then occurs: Has appellee met that requirement? The answer to this

---

[1] Subsequent amendments to paragraph 1772 have no application to the question here involved.

query depends upon a determination of whether or not paper in every respect similar to that which is conceded to be "Standard newsprint paper" except as to width (being 15 inches wide only), is such paper as belongs to the class of paper which was chiefly used for printing newspapers on and prior to June 17, 1930. While it is not improper to consider the use of paper which constituted the instant importation for the purpose of determining its character, it is well settled that such use is not controlling of its classification. *United States* v. *Swift & Co.*, 14 Ct. Cust. Appls. 222, T. D. 41706. The chief use of all imported paper and paper produced in this country, of the particular type and width as that at bar, on the date of importation, is also not controlling. *United States* v. *F. W. Myers & Co., Inc.*, 24 C. C. P. A. (Customs) 464, T. D. 48913.

It is equally well established that the mere fact that paper like that involved (15 inches wide) was not chiefly used for printing newspapers on or prior to the passage of the tariff act is not necessarily controlling if it is held that it belonged to a class of paper which was chiefly used for printing newspapers on and prior to the date of the passage of the act. It seems to us, therefore, under the instant record, that the ultimate question to be determined is whether or not the particular paper here involved should be held to belong to a class or standard of newsprint paper which was admittedly chiefly used for printing newspapers on and prior to June 17, 1930.

"Standard newsprint paper" is a designation by use. In determining the meaning of an *eo nomine* designation, which meaning is determined by its use, we must determine that meaning in accordance with its proven chief use on and prior to the date when the language which is being interpreted was used by Congress. *Goldsmith's Sons* v. *United States, supra; Wilbur-Ellis Co. et al.* v. *United States, supra; United States* v. *F. W. Myers & Co., Inc., supra.*

Accordingly, we are here required to ascertain "whether or not paper in every respect similar to that which is conceded to be 'Standard newsprint paper' except as to" thickness (being 0.0047 of an inch thick) "is such paper as belongs to the class of paper which was chiefly used for printing newspapers on and prior to June 17, 1930." This, of course, necessitates a review and analysis of the evidence before us, for only through the mouths of those familiar with papers chiefly used in the printing of newspapers when the present tariff act became a law, and qualified to speak thereof, can we find the answer to this question. "* * * chief use is a question of actual fact which, in a case of this character, should be established on the basis of positive testimony representative of an adequate geographical cross section of the nation." *L. Tobert Co., Inc., American Shipping Co.* v. *United States*, 41 C. C. P. A. (Customs) 161, C. A. D. 544.

The first witness for plaintiff was Fred B. Gundlach, purchasing agent and production manager of the Oakland (California) Tribune. He testified that the involved paper was consumed in the printing of consecutive issues of the Oakland Tribune, commencing with July 1, 1949, and produced a book file containing copies of newspapers printed during the month of July 1949, which was received in evidence as plaintiff's exhibit 2.

Plaintiff's next witness was Harold B. Forsterer, assistant secretary-treasurer and auditor for The Tribune Publishing Company. His connection with the Oakland Tribune dates back to 1911 and includes every kind of position, except that of photoengraver and stereotypist. As auditor for the company for 27 years, and as its assistant secretary and treasurer for 12 years, handling primarily general business matters, accounting, and finance, he stated that, although his knowledge of newsprint was not of a technical nature, he can tell fairly good newsprint when he sees it. It must have a certain amount of strength to be able to go through a press; it must be able to absorb ink, "in other words, it can't have a hard finish like a writing paper"; and it must have a certain content and color. In the opinion of this witness, all the papers for the month of July 1949, as evidenced by plaintiff's exhibit 2, were printed on standard newsprint of the class or type of paper which, in his experience, was chiefly used by newspapers in 1930. He further stated that the thickness of the paper does not make a material difference in its use for the printing of newspapers.

Forsterer discussed the worldwide shortage of newsprint which obtained in 1949 and his efforts, along with those of three other newspapers in California, to rehabilitate a Norwegian mill to augment his own paper's supply. He also testified that his paper does not employ a newsprint chemist but relies upon the manufacturer's chemist to maintain proper standards.

Plaintiff's third witness was Donald L. Jeffries, first vice president of the Powell River Sales Corp. for about 11 years. He stated that the Powell River Sales Corp. is a subsidiary of the Powell River Sales Co., Ltd., of Vancouver, British Columbia, which, in turn, is an outlet of Powell River Co. of Powell River, British Columbia. The business of those companies is the manufacture and sale of newsprint and pulp. In the opinion of this witness, the Powell River Co., Ltd., is the largest single newsprint paper mill in the world, the volume of that mill being about one-fourth in the world. Prior to his association with the Powell River Sales Corp., Jeffries was, for approximately 14½ years, the sales manager for Blake, Moffitt & Towne, paper jobber on the entire Pacific Coast, selling to publishers of both daily and weekly newspapers. Before going with Blake, Moffitt & Towne, he was in school. In his capacity as sales manager for that firm, he participated in bringing the Powell River organization's distribution of newsprint into the Pacific Coast.

When asked to describe the characteristics of newsprint paper, Jeffries stated:

No. 1, it is usually the cheapest grade of paper manufactured, consisting of approximately 85 per cent ground wood pulp, the balance unbleached sulphite pulp or bleached sulphate pulp. I might say plain ground wood being the cheapest

ground wood there is, a sheet of enough strength to be led through a rotary press, to be able to absorb letter press ink by absorption, having a bright enough whiteness to give contrast to ink, but normally not to last more than 12 hours.

After examining the newspapers in plaintiff's exhibit 2, this witness was of opinion that they were printed on standard newsprint, as he has known that product, and that the thickness of the paper does not take it out of the class of paper which was chiefly used for the printing of newspapers *since* 1930. He believed that the difference in thickness and finish of the imported paper was occasioned by the lack of calendering; that this paper was "much over-thickness, yet conforms to the other standards."

On cross-examination, Jeffries stated that calendering is the running of rough sheets of newsprint, as it comes out of the driers, through steel rollers. This creates a finish or smoothness which enables the paper to take halftones or pictures, "the smoother the sheet the better the reproduction." Basically, there has been little change in the process of calendering of newsprint between 1930 and 1949. He is able to tell the degree of calendering by the feel of the sheet. From what he could see of the imported paper, it lacked calendering and was without finish. In this respect, it differed from standard newsprint sold both by his present company and the one with which he was formerly associated. However, it "obviously has been printed, been used by a daily newspaper resembling newsprint, comes into all the Customs regulations of newsprint, and there is nothing else close to newsprint."

This witness further testified that his company employs 25 or 30 chemists, at least 6 full-fledged doctors of philosophy, whose function is to test everything from the growing of timber through to the finished product. In connection with newsprint, they check for strength, color, base weight, and finish, trying to keep the product within certain standards.

With regard to the newsprint famine during the year 1949 and thereabouts, Jeffries stated that it caused his company to run its machines much faster than normal, and, frankly, the standards and quality are "going to slip a bit." He then testified:

X Q. Specifically, wouldn't you say that a sheet of paper in this Exhibit 2 is inferior to the type of standard newsprint which your company was selling at or about 1949?—A. This particular lot, yes.

X Q. In what way would you say it is inferior?—A. All I have to go on is by the obvious physical looks of it, from the sheet itself. It has a very rough finish. It is rougher than we'd wish to supply ourselves from I should say lack of calendering.

For the defendant, William N. Hurlbut was the first witness. He testified that he is associated with International Paper Co., a firm engaged in the business of manufacturing and selling paper and pulp.

He has been vice president of this company continuously since 1928, a director thereof since some time in 1931. Initially, his duties were chiefly the sale of newsprint. Since the sale of his company's newsprint was transferred to a Canadian subsidiary, his activities have been more general, of an advisory nature and supervision of the operation of one of his company's plants.

From 1924 to 1928, Hurlbut was with the George H. Mead interests, which included the manufacture and sale of newsprint and some other grades of paper. Prior thereto and beginning in June 1910, he was employed by the Minnesota & Ontario Paper Co. of International Falls, Minn., which was engaged exclusively in the manufacture and sale of newsprint. During all of his experience, he has been in contact with the mills to determine what kind of paper was being manufactured, has many times observed the method of manufacturing standard newsprint, and has been familiar with the term "standard newsprint" since a few years after 1910.

At and prior to 1930, International Paper Co. sold in the neighborhood of 600,000 tons of standard newsprint to between 300 and 400 newspapers, mainly east of the Mississippi River, including such large publications as the New York Daily News, the Kansas City Journal, the Chicago Tribune, the St. Louis Post-Dispatch, the New York World, Hearst, and a number of Scripps-Howard newspapers. It sold as far south as the Gulf, New Orleans, and Florida, north to the Canadian border, and had one customer in Los Angeles. Prior to 1930, approximately 75 per centum of all standard newsprint paper was consumed east of the Rocky Mountains.

Hurlbut stated that, in 1930, the trade understanding of standard newsprint paper was as follows:

It is a sheet of paper made up of approximately 80 per cent ground wood, 20 per cent unbleached sulphite, weighing approximately 32 pounds per ream, 24 x 36, 500 sheets, approximately .003 of an inch thick, with very little sizing.

This is what he would have delivered, had he received an order for standard newsprint at or prior to June 17, 1930. Paper with a thickness of over 0.004 of an inch would not have been a good delivery for standard newsprint at that time, as thickness was, and is, one of the controlling factors in determining what is standard newsprint. Paper standard in all respects, but with a thickness of 0.0047 of an inch, would not have been considered standard newsprint at and prior to June 17, 1930. It did not belong to that class, kind, or character of paper which was chiefly used for the printing of newspapers at that time. It would be termed tabloid or novel news.

On cross-examination, Hurlbut testified that the trade understanding of the term "standard newsprint" became a custom over the years, largely initiated by an earlier Treasury Department definition having

definite specifications. The trade would be governed by the Treasury definition, the printability of the paper, and the requirements of the customers. Newsprint must be printable, must take ink readily, and must produce a good-looking sheet. There are, moreover, various degrees of printability. A smooth sheet of paper will print better and take halftones better than a rough sheet.

Hurlbut also stated that he was not certain whether his company's invoices and contracts in 1930 contained the words "standard news-print," but he believed that they did. The contracts would specify roll weight, basis weight, approximately 32 pounds, 24 by 36, 500 sheets, without reference to production basis and white. There would be no mention of absorbency. The Treasury Department's current definition of standard newsprint specifies a thickness of not over 0.004, with an upward tolerance, under certain circumstances, of 5 per centum. Paper with a thickness of 0.0035 would be standard news-print, as would paper with a thickness of 0.0038, but the latter would not be quite so satisfactory to the customer as a thinner sheet. It would be somewhat bulky and might be considered a borderline case. Paper known as novel news, into which category this witness placed the instant paper, is ordinarily approximately 0.005 of an inch.

Hurlbut examined about 100 pages of plaintiff's exhibit 2, and found a sheet in the July 2 and in the July 12 issues, which he considered to be of a bulky or thick quality. He mentioned, however, that news-print deteriorates rapidly, because it is made principally of mechanical pulp.

On redirect examination, this witness reiterated that the usual thickness of paper used by newspapers, at and immediately prior to June 17, 1930, was approximately 0.003 of an inch and that newspapers at that time did not generally use paper which was 0.0047 of an inch thick.

Frederick W. Mears was also called to testify on behalf of defendant. He stated that he is assistant manager of sales for newsprint for the Great Northern Paper Co., with which firm he first became associated in June 1916 as an apprentice. Subsequently, he was in the manu-facturing department, ground wood foreman, superintendent, assistant supervisor of the company's mill at East Millinocket Mills, and super-intendent of its mill at Madison, Maine. In 1929, he was transferred to sales, with a territory which included New England and New York State, and became assistant manager of sales in 1936. As a result of this experience, Mears was familiar with the term "standard news-print," as used in the trade at or prior to June 17, 1930, and his under-standing of that term was the same as that of the previous witness.

At and prior to June 17, 1930, the Great Northern Paper Co. sold standard newsprint to 167 newspapers in an area as far west as St. Louis, as far south as Macon, Ga., including the Bangor News, the

Portland Press Herald, the Boston Press, the Hartford Courant, the New York Sun, Scripps-Howard newspapers, the Philadelphia Inquirer, and the Philadelphia Bulletin. At that time, this company was rated as the largest producer of standard newsprint in the United States and had a production of about 315,000 tons.

Witness Mears' statement of the trade understanding of the term "standard newsprint" was as follows:

Principally it is a sheet of paper 24 by 36, weighing 32 pounds, for 500 sheets. It has to be suitable to' run on a press and print, and to give satisfactory results. Therefore, early in 1920, we began making newsprint that didn't caliper much over three point, and if a great deal of it ran high over that we just heard from the customers that it was no good. They didn't want it.

This, he said, was the case as far back as 1921 and was true in 1930. He also stated that his company never sold as standard newsprint any printing paper with a thickness of over 0.004 of an inch. Such paper was not known in 1930 as standard newsprint. It was known as novel news, novel paper, or tablet paper. Based upon his experience, paper which is standard in all respects, except that it has a thickness of 0.0047, did not belong to that class, kind, or character of paper which was chiefly used for the printing of newspapers at or prior to June 17, 1930.

On cross-examination, Mears stated that his previous expression of the trade understanding of standard newsprint was, in effect, a trade requirement. Customers would have objected strenuously if the paper did not have a smooth finish for taking halftone cuts. He said:

I had in mind that the customers had required that the finish is increased to about three points long before 1930, because of the fact that they were running many, many more cuts in their newspapers, and they wanted to get good reproduction so that it was a trade requirement.

On this state of the record, we are of opinion that the weight of the evidence sustains the position maintained by the defendant that printing paper, having a thickness of 0.0047 of an inch, was excluded from that class, character, or kind of paper chiefly used for the printing of newspapers at and prior to June 17, 1930. This conclusion is predicated in large part upon the qualifications of the various witnesses who testified.

So far as this record shows, plaintiff's witness Forsterer was a man whose entire newspaper experience derived from his association with a single newspaper, to wit, the Oakland Tribune. He knew, and was qualified to tell, what kind of paper was used by that publication to print its newspapers, but there was nothing in his background to support the categorical statements that the paper at bar was of a kind *chiefly* used by newspapers in 1930 or that, in connection with such use, thickness was not a material factor.

The experience of plaintiff's witness Jeffries was likewise qualified in scope. The recital of his business relationships places him in the field of newsprint paper no earlier than 1929 at which time, having just completed his education, he became associated with Blake, Moffitt & Towne, paper jobber on the "entire Pacific Coast." He gave no evidence of the extent of the activities either of his employer or of himself, other than to say that it sold to publishers of both daily and weekly newspapers.

Moreover, although he was of opinion that the thickness of the paper does not take it out of the class of paper chiefly used for the printing of newspapers, he was frank to admit that the paper at bar, as illustrated in plaintiff's exhibit 2, was "much over-thickness," and, by reason of lack of calendering or finish, differed with and was inferior to the standard newsprint sold both by his present company and the one with which he was formerly associated.

On the other hand, defendant's witness Hurlbut became familiar with the term "standard newsprint paper" within a few years after he first entered the field in 1910. He had personal experience with the manufacture and sale of newsprint for many years prior to 1930. At or about that date, he was vice president of a firm which produced and sold in the neighborhood of 600,000 tons of standard newsprint to between 300 and 400 newspapers. Although the bulk of this business was conducted east of the Mississippi River, it appears, by virtue of Hurlbut's uncontradicted statement, that approximately 75 per centum of all standard newsprint paper was consumed east of the Rocky Mountains.

Defendant's witness Mears also had a background in the manufacture and sale of newsprint which long antedated the enactment of the present tariff law. In 1930, his company had a production of some 315,000 tons, which were sold to 167 newspapers in substantially the same area covered by Hurlbut's firm, although the witness, himself, was then selling in New England and the state of New York only.

We are constrained to accept as controlling the unqualified statements of both Hurlbut and Mears that paper, standard in all respects, but with a thickness of 0.0047 of an inch, did not belong to that class, kind, or character of paper which was chiefly used for the printing of newspapers at and prior to June 17, 1930, but rather that it was of a character of paper then known as novel news, novel paper, or tablet paper.

Plaintiff urges that by enacting paragraphs 1401 and 1772, *supra*, in 1930, without a limitation as to thickness, Congress manifested an intention to disregard this quality as a material aspect of standard newsprint paper. Its argument is predicated upon the alleged fact

that Congress was specifically requested to impose this limitation but, nevertheless, omitted to do so.

As pointed out by counsel for defendant, however, the request for a modification of the phrase "standard newsprint" contained considerably more than a thickness limitation. Congress was also asked to place restrictions upon the content, weight, and size of rolls and sheets of newsprint paper imported into the United States. See statements of representatives of the American Newspaper Publishers' Association before the Committee on Ways and Means of the House of Representatives, Seventieth Congress, Second Session, volume XV, pages 9341, 9350. In rejecting all of these recommendations, Congress, at least by implication, reaffirmed the proposition that standard newsprint paper is that class of paper chiefly used for the printing of newspapers. *Crown Willamette Paper Co.* v. *United States, supra*; *United States* v. *James P. Heffernan Paper Co., supra*; *United States* v. *C. J. Tower & Sons, supra.*

We have determined from the record before us that uncoated printing paper, having all the characteristics of what is concededly standard newsprint paper, except for thickness, was not of the kind, class, or character of paper chiefly used for the printing of newspapers at and prior to June 17, 1930. Plaintiff's claim for free entry of the paper at bar as standard newsprint paper is, therefore, overruled.

Judgment will be entered accordingly.