(C. D. 1341)

MALMAR PAPER CO. ET AL. *v.* UNITED STATES

## United States Customs Court, Second Division

(Decided June 26, 1951)

*Benjamin A. Levett* (*Benjamin A. Levett* and *Meyer Ohlbaum* of counsel) for the plaintiffs.

*David N. Edelstein*, Assistant Attorney General (*Arthur R. Martoccia*, special attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; FORD, J., concurring

RAO, Judge: Plaintiffs herein seek to recover duties alleged to have been illegally assessed upon various shipments of printing paper imported from Austria. The collector of customs at the port of New York classified said merchandise as uncoated printing paper and assessed duty thereon at the rate of one-fifth of 1 cent per pound and 5 per centum ad valorem, pursuant to the provisions of paragraph 1401 of the Tariff Act of 1930, as modified by the trade agreement with Canada, 74 Treas. Dec. 235, T. D. 49752, or the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802. It is the claim of the plaintiffs that the paper in question should have been permitted free entry as "Standard newsprint paper," which is provided for in paragraph 1772 of said act.

The applicable statutory provisions are as follows:

Paragraph 1401, Tariff Act of 1930, as modified by the trade agreements above enumerated:

| Tariff Act of 1930 paragraph | Description of article | Rate of duty |
|---|---|---|
| 1401 | Uncoated papers commonly or commercially known as book paper, and all uncoated printing paper, not specially provided for, not including cover paper | ⅕¢ per lb. and 5% ad val. |

Paragraph 1772, Tariff Act of 1930:

PAR. 1772. Standard newsprint paper.

By virtue of the decisions of the Court of Customs and Patent Appeals in the cases of *United States* v. *F. W. Myers & Co., Inc.*, 24 C. C. P. A. (Customs) 464, T. D. 48913, and *United States* v. *C. J. Tower & Sons*, 26 C. C. P. A. (Customs) 1, T. D. 49534, it is now well established that the provision in paragraph 1772, *supra*, for standard newsprint paper is an *eo nomine* designation by use. In order for imported paper to find classification thereunder, it must be shown that such paper was of the class, kind, or character of paper which was

chiefly used for the printing of newspapers at or prior to the enactment of the Tariff Act of 1930.

The collector's classification of the instant merchandise as uncoated printing paper within the provisions of paragraph 1401, *supra*, is presumptively correct. Moreover, inasmuch as the collector, in his answers to the protests, omits to assign any specific reason for his classification, it may not be assumed that he predicated his denial of free entry to these importations upon any grounds specified in the reports of the Government chemist of the results of analyses of samples of the merchandise at bar. The collector, not the chemist, is the classifying officer. It was, therefore, incumbent upon the plaintiffs herein to establish by competent proof that the imported paper fell within the category of papers which were chiefly used in the United States for the printing of newspapers on or before June 17, 1930.

Counsel for the plaintiffs maintains, however, that the involved paper was so-called new merchandise, not of a class or kind in use during the period when the Tariff Act of 1930 was enacted, and hence that this case should be governed by the principle enunciated in the cases of *United States* v. *Georgia Pulp and Paper Manufacturing Co.*, 3 Ct. Cust. Appls. 410, T. D. 32998, *Sheldon & Co.* v. *United States*, 4 Ct. Cust. Appls. 42, T. D. 33265, and *W. J. Green* v. *United States*, 8 Cust. Ct. 173, C. D. 599, to the effect that the use thereof, at the time of importation, is the controlling factor.

We do not find it necessary here to determine whether printing paper of a character which was not available for use in the printing of newspapers in 1930, but became so, at any time subsequent thereto, and actually served that purpose, falls within the category of standard newsprint papers, as that term appears in paragraph 1772, *supra*, for the reason that the record in this case does not establish that the involved paper was in fact new merchandise. There is no evidence whatsoever which would support an affirmative finding to that effect.

Accordingly, we are here concerned solely with the question of whether or not the importations at bar were of a class or kind of paper chiefly used for the printing of newspapers at or prior to June 17, 1930. This being so, we necessarily must reject as incompetent the testimony of plaintiffs' witnesses, Morris M. Kirpich, the sole owner of the Malmar Paper Co., one of the importers here involved, and Adalbert Greiner, president of the company which sold the involved merchandise to the Malmar Paper Co. Mr. Kirpich testified that he was but 28 years of age, at the time of trial, and had been in the business of importing and selling paper only since 1947. Obviously, he could not testify with respect to what classes or kinds of paper were chiefly used for the printing of newspaper in 1930. Nor could

he state whether the papers imported by him belonged to the class of papers chiefly so used as of that date.

As for the witness, Greiner, although he attested to 45 years of experience in the business of importing and exporting paper, the major portion of that business was conducted in Austria. He did not come to the United States until 1940. He did not commence his contacts with the newsprint paper trade in the United States until 1945. He could not, therefore, know what classes or kinds of paper were chiefly used in the United States, in 1930, for the printing of newspapers.

The only one of plaintiffs' witnesses who had such knowledge was George Guy Cobean, who had been in the business of exporting and importing paper of all kinds for over 40 years, and had been familiar with the term, standard newsprint paper, since prior to 1930. He described such paper as follows:

It is white paper, the furnish of which—furnish meaning the proportions of pulp—does not exceed 20% sulphite and the balance ground wood. It may or may not contain loading clay. It has to be of a basis weight of approximately 52 grams, which is 32 pounds, and there is leeway up or down, 30 to 35 pounds.

He stated further that the question of the ash content of the paper does not enter into the specifications for newsprint paper in the United States, but that paper with excessive limits of ash content would be difficult to print on; that the ash content is determined by burning the paper; that the actual fiber leaves some ash, but it is generally the amount of loading clay which is put into the paper to produce a sheet which will print more readily that causes the ash content; and that if the ash content were excessive, it would have an effect in determining whether or not the paper was standard newsprint. The addition of clay which increases the ash content of paper would also weaken the fiber and lessen the tensile strength of the paper. Clay is used, however, because it improves the finish for printing purposes.

In the opinion of this witness, standard newsprint paper, as understood in the United States, is that paper which has an ash content of no more than 6 per centum. He stated further that generally when you specify newsprint in the United States you would not now, and did not in 1930, get any higher ash content than 7 per centum; that loading clay producing an ash content up to 10 per centum would not be a disadvantage in newsprint paper but that more than that would reduce the strength so it would not run over the press and the paper might powder off.

This witness also testified that newsprint paper for use in certain South American countries was water-lined so as to guarantee its free

entry and enable it to be identified for its end use in the printing of newspapers; and that, although water lines would not, in any way, affect the use for the printing of newspapers, paper with water lines was not commonly so used in the United States, either in 1930 or at the time of trial.

Four witnesses, all with exceptionally wide and lengthy experience in the paper trade generally, and with newsprint paper in particular, who are associated with the leading paper manufacturing firms of the United States, testified on behalf of the defendant. Their combined contacts with newspapers covered an area in the United States extending from Maine to the Gulf of Mexico, from the eastern seaboard to the Rocky Mountain range. All of them had dealt extensively in newsprint paper prior to 1930 and were familiar with the term, standard newsprint paper. While their definitions of standard newsprint paper, as that term was understood in the trade of the United States from 1930 to the date of their testimony, differed slightly as to the relative proportions of sulphite pulp and ground wood pulp used in the composition of such paper, and as to what precise percentage of ash content was normally found therein, they were all agreed that paper with an ash content in excess of 6 per centum was not considered in the trade as standard newsprint paper, and that neither paper with water lines nor paper weighing in excess of 35 pounds per ream was so regarded. Some of these witnesses stated that their respective firms manufactured certain paper, standard in all respects as to size, width, thickness, and finish, but with a higher ash content, to wit, from 7½ per centum to 25 per centum, and that such paper known as ground wood-printing paper, or ground wood specialty paper, is used for the printing of farm tracts, magazines, and books.

These witnesses were in agreement with plaintiffs' witness, Cobean, that paper with a high ash content would not be suitable for the printing of newspapers for the reason that it would dirty the type of the fast presses used for printing newspapers and make it necessary for more frequent stops for cleaning. In view of the nature of the newspaper business, the relatively few hours allotted to meeting the deadline, and the type and speed of the presses used, it was their considered opinion that a high ash content was not desirable in newsprint paper.

It appears from the reports of the Government chemist, which are in evidence in this case that, except with respect to entry number 301353, covered by protest 148655–K, and sample MG 58, taken from one of the rolls in entry 317496, protest 149333–K, the lowest ash content of any of the paper examined by him was 7.3 per centum and the highest was 15.9. In addition, the weight of the paper covered by entry 306879, in protest 152267–K, was 41.6 pounds per ream; that of the paper involved in entry 306878, protest 152267–K, was 37.3

pounds per ream; and that in sample 183, taken from entry 301353, in protest 148655–K, was 36.6 pounds per ream. It further appears that certain of the sample paper analyzed had watermarks between 1½ and 2 inches apart.

The overwhelming weight of the testimony in this case is to the effect that neither prior to June 17, 1930, nor at any time subsequent thereto, was paper with an ash content in excess of 6 per centum, or paper with water lines, or paper which weighed more than 35 pounds to the ream, chiefly used for the printing of newspapers. We do not consider it material that, as stipulated by counsel for the defendant, most if not all of the imported papers were sold to newspapers, and used by them in their regular editions. That concession shows merely the susceptibility of the paper for that use; but that admission is not sufficient to establish that paper of that class or kind was chiefly used in the printing of newspapers at the time of the enactment of the present tariff law. *United States* v. *F. W. Myers & Co., Inc., supra.*

Neither do we believe, as argued by counsel for the plaintiffs, that the testimony of defendant's witnesses is incompetent because they never dealt in imported paper of the kind here involved. These were witnesses who were fully conversant with the needs of the newspaper trade. They knew the kind of paper which they supplied to newspapers in the United States, upon receipt of orders for standard newsprint paper. They were, therefore, competent to testify as to what character of paper they in fact delivered in fulfillment of those orders. They were also qualified to testify with respect to the uses to which paper, manufactured by them and meeting the description of the imported papers, was put. *Lamont, Corliss & Co. et al.* v. *United States*, 16 Ct. Cust. Appls. 488, T. D. 43224.

The testimony of these witnesses, which is fairly though not completely supported by the evidence adduced on the part of the plaintiffs, convinces us that the merchandise at bar was not of the class, kind, or character of paper which was chiefly used for the printing of newspapers in the United States, either at the time of importation, or at any time prior thereto, and that it is not standard newsprint paper within the meaning of that term as employed in paragraph 1772 of the Tariff Act of 1930, *supra.*

One further question requires consideration herein. It appears that samples of two rolls of paper covered by entry 301353, in protest 148655–K, were extracted for analysis by the Government chemist. Sample 303 was found to conform in all respects to the requirements for standard newsprint paper set forth in Treasury Decisions 40996, 45418 (4), and 50120 (4) and was classified as standard newsprint paper. An analysis of sample 183 showed that it did not conform to such requirements in that it weighed 36.6 pounds per ream upon

original testing and 35.8 pounds upon retesting, and the collector assessed duty thereon, pursuant to the provision in paragraph 1401, *supra*, as modified, for uncoated printing paper. The correctness of that classification flows from what we have heretofore said concerning paper weighing in excess of 35 pounds to the ream. Besides the 2 rolls from which samples were taken, there were 165 additional rolls, not analyzed, which the collector accorded the same treatment as that of roll 183. Although counsel for plaintiffs argues that the collector "arbitrarily assumed, without any evidence that the remaining rolls were represented by roll No. 183 and therefore overweight," there was no evidence offered in their behalf tending to show any other weight for the unexamined rolls. We therefore find that the presumption of correctness inherent in the collector's classification with respect to these entries has not been overcome.

By reason of the foregoing, the claim in the protests enumerated in the schedule of protests attached to this decision is overruled.

Judgment will be entered accordingly.

### CONCURRING OPINION

FORD, Judge: I concur in the conclusion reached by my associates solely upon the ground that this record fails to establish that the involved paper belongs to that class, kind, or character of paper which was chiefly used for the printing of newspapers at and immediately prior to the passage of the Tariff Act of 1930. Regardless of the ash content, watermarks, or weight, if the involved paper belonged to that class, kind, or character of paper which was chiefly used for the printing of newspapers at and immediately prior to June 17, 1930, it would be entitled to free entry under paragraph 1772 of the Tariff Act of 1930, as standard newsprint paper.