BEFORE THE SECOND DIVISION, DECEMBER 18, 1952

**No. 57000.**—Democrat-Herald Publishing Co. and Geo. S. Bush & Co., Inc. *v.* United States, protest 140459–K (Portland, Oreg.).

RAO, Judge:  There is involved in this case the question of the proper classification under the Tariff Act of 1930 of an importation of 72 reels of printing paper. This merchandise was classified by the collector of customs at the port of Portland, Oreg., as uncoated printing paper, and assessed with duty at the rate of one-fifth of 1 cent per pound and 5 per centum ad valorem, pursuant to the provisions of paragraph 1401 of said act, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.  Plaintiffs claim the merchandise is entitled to entry free of duty as standard newsprint paper, which is included in paragraph 1772 of said act.

It appears from the record and official papers herein that after entry was made under the claimed classification, the then examiner in charge of the importation requested of the importer and received from it samples of the paper which he forwarded to the United States chemist at San Francisco, Calif., for analysis. The chemist's report, which is in evidence as defendant's exhibit 4, reads as follows:

The sample of paper does not conform to the laboratory specifications for standard newsprint paper in that the sizing is excessive.

Penetration of water (ground glass method) requires more than 10 seconds.

Note T. D. 40996.

Upon the basis of the Government chemist's findings, T. D.'s 40996 and 50120 (4), and the examiner's and appraiser's report that the merchandise was uncoated printing paper, not specially provided for, the collector classified the merchandise within the provisions of said paragraph 1401, as modified.

An elaboration of the report of the chemist through the testimony of the individual who personally analyzed the samples reveals that in respect of weight, ash content, stock, thickness, and finish, the paper conformed with the specifications for standard newsprint paper set forth in said T. D. 40996 but that the sizing, as shown by the time of penetration under the ground-glass test, exceeded 10 seconds. Three trials were run to determine the time of penetration, and each test consumed between 12 and 13 seconds.

It may also be stated that counsel for the Government has conceded that in all respects, save sizing, the involved paper is "standard newsprint paper," and that the collector "predicated his denial upon the ground specified in the Government chemist's report (Defendant's Exhibit 4), to-wit, excessive sizing." In other words, had the test for sizing indicated a water penetration in less than the prescribed 10 seconds, it is fair to assume that the involved paper would have been passed as standard newsprint and admitted to entry free of duty, as conforming with all of the specifications set forth in the said treasury regulation, T. D. 40996.

The exposition of the circumstances surrounding the entry and classification of the instant merchandise is not to be construed as a holding that the said T. D. 40996 has the force and effect of law, or that compliance therewith would be a condition precedent to free entry under paragraph 1772, *supra*. As stated by our appellate court in *United States* v. *James P. Heffernan Paper Co.*, 17 C. C. P. A. (Customs) 61, T. D. 43358:

As to the validity of, or the force and effect to be given to, T. D. 40996, under this record, we need say no more than that if it would tend to prevent the free entry of a grade of printing paper chiefly used for printing newspapers to that extent it would be invalid. No one will contend that the Secretary of the Treasury has any authority to legislate. *United States* v. *Monroe-Goldkamp Co.*, 15 Ct. Cust. Appls. 26, T. D. 42135. If, however, for the purpose of carrying out the provisions of the act, he has provided proper tests and standards for quickly determining what standard newsprint paper is, we can see where it would be helpful to the customs officials in classification. But, such regulations must not extend or limit the provisions of the statute contrary to the intent of the legislature. It seems to us that the question as to whether imported paper is standard newsprint paper, under the rule laid down by this court, is a question which is susceptible of proof.

The rule is that the provision in paragraph 1772, *supra*, for standard newsprint paper is an *eo nomine* designation, suggestive of use, and refers only to that class or kind of paper which at and prior to June 17, 1930, was chiefly used for the printing of newspapers. *Crown Willamette Paper Co.* v. *United States*, 16 Ct. Cust. Appls. 431, T. D. 43187; *United States* v. *James P. Heffernan Paper Co.*, *supra*; *United States* v. *F. W. Myers & Co., Inc.*, 24 C. C. P. A. (Customs) 464, T. D. 48913; *United States* v. *C. J. Tower & Sons*, 26 C. C. P. A. (Customs) 1, T. D. 49534; *Malmar Paper Co. et al.* v. *United States*, 27 Cust. Ct. 16, C. D. 1341. The burden of presenting proof to this effect necessarily lies with the party which claims the merchandise in issue is "standard newsprint paper."

Inasmuch, however, as it is here conceded that in all respects save that of sizing the involved paper is standard newsprint, which means, of course, that except for sizing, the paper was of the class which in 1930 was chiefly used for printing newspapers, the issue in the instant case is limited to the question whether paper which contains sizing in excess of that contained in paper admitted to be standard newsprint was, nevertheless, a class of paper which in 1930 was chiefly used for the printing of newspapers. On this question, plaintiffs offered the testimony of four witnesses, and no witnesses were called by defendant.

Plaintiffs' first witness in this connection was Ralph R. Cronise, publisher of the Albany Democrat-Herald, a daily newspaper published in Albany, Oreg. He

testified that he has been engaged in newspaper work for more than 40 years, having been employed on the Salem Statesman, the Eugene Register, the Albany Democrat, the Grants Pass Courier, and the Oregon Journal, before becoming publisher of the Albany Democrat-Herald nearly 32 years ago. Mr. Cronise placed the order for the merchandise at bar through a broker in Los Angeles because his paper was unable to obtain an ample supply of newsprint from the local mill during the war shortage. The paper was purchased for the purpose of using it in the printing of newspapers on a rotary web press known as the Goss Unitube and, except for certain portions damaged in shipment, was actually used for that purpose. The paper was in the form of rolls, 33½ inches in width and a diameter of about 34 inches. The witness stated that he did not know of any use for paper of the character here imported when put up in rolls of that size as of June 1930, other than in the printing of newspapers, and if there were any other uses for paper of this character since June 1930, he did not know of them. In his opinion, the characteristics which make a paper suitable for the printing of newspapers are its tensile strength, width, ability to absorb ink, its weight or thickness to a degree, and its color. These were the characteristics of newsprint paper in June 1930 and also to a sufficient degree of the paper involved in this case. During his 30-odd years as publisher of the Albany Democrat-Herald and the printing of newspapers, his supply of newsprint was purchased from the Crown Willamette Paper Co., whose mills are located at West Linn, near Portland. Such supply possessed these characteristics.

On cross-examination, Cronise testified that the paper in the shipment at bar was essentially of the same quality, but of a grade inferior to that regularly supplied by his American mills. It was, however, good enough for use in this emergency and was used by his newspaper. He stated further that at and prior to June 1930, he was not familiar with the degree of sizing required in standard newsprint paper, but "being around newsprint the greater part of my life and observing different newsprint in use, it all seemed very much the same all of the time that I have known it." In fact, there was no degree of sizing required. The paper he purchased was not supposed to have any sizing. It was unglazed newsprint.

This witness was not clear as to what sizing is, nor whether sizing was specified in his contracts for the purchase of newsprint paper. He thought, however, that it probably would not be included.

On redirect examination, Cronise testified that he removed some samples from one of the damaged rolls in the importation and delivered them to a Mr. Ralph Dickey for testing. He also stated that he never thinks of sizing in the purchase of newsprint.

Ralph R. Dickey, called as a witness on behalf of plaintiffs, stated that he has been employed by the Crown Willamette Paper Co. or Zellerbach Corp. for 43 years; for the last 4 years, he has been northwest sales manager of Crown Willamette Paper Co.; for 15 years prior to that, he was in charge of the Seattle office after having been in San Francisco and in Portland for the same company. During all his 43 years, he has been handling every item that the corporation manufactures, including newsprint, wrapping paper, paper bags, and fruit paper. Presently, he is in charge of sales of the entire line of the company, including newsprint, and has men selling in the 11 states west of Denver. He, himself, has been selling in that area for 33 years. This witness recalled receiving a sample of paper from the previous witness and stated that he sent it to Ed Nunn, his company's head chemist, at its West Linn, Oreg., mills. Upon being asked to examine the three sheets taken from the instant importation, which were in evidence as plaintiffs' collective exhibit 1, this witness did so, and stated that so far as he was able to tell from that examination the grade would indicate that it

is standard newsprint. His conclusion was based on the fact that it was of sufficient strength to operate on a press and had a reasonably white color. Another element of importance is that it should be able to absorb ink readily, in order that the ink can dry before the paper reaches the folding state. In the opinion of this witness, he would have recognized plaintiffs' collective exhibit 1 as standard newsprint paper 20 years ago and as well on June 18 [sic] 1930, at which time he was in charge of the Seattle office of the Crown Willamette Paper Co.

Edward H. Nunn testified that he has been employed by the Crown Zellerbach Corp. at West Linn, Oreg., since 1930, and that since May 15, 1942, he was technical supervisor having to do with the operation of a process control and development laboratory in the paper mill. The Crown Willamette Division of the Crown Zellerbach Corp. at West Linn makes newsprint, coated magazine papers, butcher papers, and sulphite specialty and screening wrappers. Before 1942, he worked for 4 years in the western wax division of the same corporation, in Oakland, Calif. This is a printing and waxing or converting division of the corporation. Prior to that, he was doing research work in the laboratory of the same company at its Camas, Wash., mill, where a large variety of specialty papers, including printing papers and wrapping papers chiefly are produced. It did not produce any large amount of newsprint paper. Prior to that and for a period of about 6 months from the end of March until Labor Day of 1930, he was a chemist in the laboratory at West Linn handling testing of paper, including newsprint paper and development and research work. Upon the request of Mr. Dickey, this witness tested a sample of paper received from him during the middle of 1948 to determine its comparative utility value as a newsprint as related to his company's product and found it to be substantially newsprint paper. Tests were made to determine strength, surface smoothness, ink receptivity, fiber quality, and brightness. The paper which was tested came within the standards of standard newsprint paper as he knew such standards both at the time of testing and as of June 1930.

On cross-examination, witness Nunn stated that he is a graduate chemist from the University of British Columbia; that he tested the samples for sizing by the sugar dye method, a method prescribed by the Technical Association of the Pulp and Paper Industry, which is an association supported by the pulp and paper industry for the organization and dissemination of technical knowledge; that it issues prescribed standard methods for testing all varieties of paper after such methods are approved by the members of the industry; that the groundglass method of testing is not recognized by that association as a standard method; that paper is tested for sizing to determine its water resistance, but that the question of sizing is not necessary in the use of paper as newsprint paper because newsprint paper is not ordinarily required to have any degree of water resistance; that an oil-base ink such as is used by newspapers would be absorbed by a very heavily sized paper just as readily as by a paper which has no sizing at all; that the paper submitted to him for testing was substantially newsprint, that is, in its essential characteristics of surface smoothness, fiber content, color, brightness, strength, dirt content, and ink receptivity.

On redirect examination, this witness explained that sizing "is a term used to describe the addition of a material known as rosin size to paper, to improve its resistance to water, and rosin size is made from rosin obtained from pine trees in Georgia, onto the paper, and precipitated on the fibers by means of ordinary alum." The purpose of the water penetration test he made was to determine the water resistance of the paper which is normally obtained by sizing. He stated further that a 2 per centum size would be known as a heavily sized paper and, although they did not analyze the sample for its content of rosin size, the sample was not as heavily sized as that.

A. George Lutz, also called as a witness for plaintiffs, stated that he is in the paper business and has been so engaged continuously since 1911. He has dealt in a general line of paper, "all the way from newsprint and wrapping papers" and has sold papers everywhere east of the Rockies. In 1917, he operated a paper mill at Cornwall-on-the-Hudson and for several years prior to 1944, he ran a paper mill at Sheboygan. He has also been a mill agent. At Cornwall, his mill made ground wood printing paper; at Sheboygan, ground wood book paper, and paper free of ground wood were made. In 1929 and 1930, he was vice president and sales manager for a paper mill at Clayville, N. Y. At different times throughout his business experience and particularly on June 17, 1930, he has been familiar with and has bought and sold standard newsprint paper. The witness stated that he is familiar with paper of the character of that in plaintiffs' collective exhibit 1, and was familiar with it on June 17, 1930; that he was able to tell from an examination of those sheets whether or not they are standard newsprint paper; and that, in his opinion, it is standard newsprint. He has sold newsprint all through the years to paper jobbers, usually, who in turn sold newsprint publishers, and in some cases he has sold direct to newspapers. Upon being asked to make an examination of plaintiffs' collective exhibit 1 to verify his opinion that it is standard newsprint, Lutz stated "that the weight of the paper is exactly so-called 32 pound standard newsprint paper; the color and formation and physical appearances make it look exactly like standard newsprint paper." He then tore a piece from the exhibit to get its strength and said that it tears like standard newsprint. He also wrote on the paper with ink and stated that it did not show excessive sizing because the ink penetrates without running but does not go through the other side. If it had undue sizing, the ink would run. He also wet a piece with his tongue and found that water penetrates the paper, whereas, in his opinion, if it were sized excessively, it would take some time for water to penetrate to the other side. Upon interrogation by counsel, Lutz made the following answers:

Q. As a matter of fact, during the course of your experience, have you ever known standard newsprint paper to be sold on a basis of sizing?—A. No, not that I ever heard of.

Q. Is the amount of sizing in standard newsprint paper on June 17, 1930, a determining factor in its use in newspapers?—A. Not that I know of, no.

Cross-examination of this witness was lengthy and detailed. It revealed that at or about June 17, 1930, he was in the paper business in New York City, trading in most any kind of paper that happened to come up; that he could not remember whether he bought or sold any standard newsprint at that time; that he had been trading in standard newsprint since 1919; that he sold newsprint paper to paper merchants in New York in 1918, 1919, and 1920, in carload lots; that during these 3 years, he also sold to the Boston American, a newspaper in Boston, Mass.; that he sold the newspaper several carloads of paper; that his business was mostly with jobbers who usually gave him shipping instructions, although he never paid any attention to what they were; that the jobbers sold to newsprint publishers or possibly for export, but he did not follow through on that; that he never manufactured standard newsprint paper; that the percentage of standard newsprint that he handled in comparison with his over-all business was small; that—

A. Standard newsprint paper is a paper which weighs 32 pounds to a sheet of 24 by 36. It is a paper made out of ground wood primarily ground wood generally about 85 per cent ground wood pulp and about 15 per cent of unbleached sulphite pulp and that percentage varies in different mills, depending on the speed of the machine and other local conditions. Some mills might find they can make a good sheet of newsprint with say 90 per cent ground wood, due to efficient operation; while other mills might use more or less sulphite, but more or less, my definition would be a paper that weighs as I said 32 pounds and contains about 85 per cent

ground wood pulp and it has this general—it is a paper of this particular color, sort of an unbleached color and is used by a paper publisher or paper publishers.

X Q. In the printing of their newspapers?—A. Yes.

He further stated that the color is usually an unbleached color; that standard newsprint usually comes in sheets or in jumbo rolls and that it has a thickness of three-thousandths of an inch; that sizing is usually an animal glue used to fill up the pores of paper, so as to lessen the absorbent quality of the paper and to make it easier to write or print on it; that standard newsprint contains a small amount of sizing; that the amount of sizing can not be determined by physical examination; that one would have to try the paper to see how it takes ink, or make tests to show its absorption of moisture in water; that the paper at bar had a fair amount of sizing and that standard newsprint would have anywhere from a small amount to a fair amount of sizing; and that the paper in the New York Daily News of March 14, 1951, which was exhibited to the witness, has less slack size than that in plaintiffs' collective exhibit 1. The witness also said that one of the tests for determining sizing is the length of time it takes for water to be absorbed by the paper. If it takes more than 10 seconds for water to penetrate the paper, the sizing would be excessive, but in the personal opinion of the witness it would, nevertheless, be standard newsprint. Commercial standard newsprint paper is generally so sized that it does not run over 10 seconds, but if a mill happened to make any paper that ran over that time, it still would be standard newsprint. In other words, sizing is not a determining factor. There is no limitation as to sizing in sales of newsprint. It is not specified by his customers nor did he buy and sell it that way. The degree of sizing in a paper will materially affect its ability to absorb ink. Ink will very quickly penetrate a paper with no sizing and will feather. In a sized paper, ink will not penetrate so quickly.

Running through the testimony of all of these witnesses is the affirmative assertion that sizing is not now, and was not in 1930, a determinative characteristic of standard newsprint paper. Paper which met certain other standards as to strength, surface smoothness, ink receptivity, fiber quality, brightness, width, thickness, weight, and dirt content, and was chiefly used for the printing of newspapers was considered to be standard newsprint paper in 1930. But whether it had a small or a fair amount of sizing or whether the degree of sizing was one that might be termed excessive was not an item which entered into commercial understanding of what was then considered standard newsprint paper.

Furthermore, each of these witnesses, whose experiences covered the newspaper publishing, the chemical, the production, distribution, and the selling aspects of standard newsprint paper at and prior to June 17, 1930, was of the opinion that irrespective of the degree of sizing in plaintiffs' collective exhibit 1 it was standard newsprint paper, as that paper was known when the Tariff Act of 1930 became a law.

In view of the concession here that in all respects, except sizing, the paper at bar was of the class of paper known in 1930 as standard newsprint, and of the testimony that the degree of sizing in paper neither affected its utility in the printing of newspapers nor entered into the commercial understanding of what was standard newsprint paper, and there being no evidence to controvert the testimony offered in this respect, we are constrained to hold that plaintiffs have sustained the burden of proving that the importation at bar falls within the class of paper which at and prior to June 17, 1930, was chiefly used for the printing of newspapers. The claim that the instant merchandise is free of duty as standard newsprint paper which is provided for in paragraph 1772 of the Tariff Act of 1930 is therefore sustained.

Judgment will be entered accordingly.