(C. D. 1797)

GEO. S. BUSH & .CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided August 2, 1956)

*Barnes, Richardson & Colburn* (*George R. Tuttle, Joseph Schwartz*, and *Edward N. Glad* of counsel) for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Mollie Strum* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

*Wise, Corlett & Canfield* (*Robert E. Canfield* of counsel) as *amicus curiae.*

Before LAWRENCE, RAO, and FORD, Judges; LAWRENCE, J., not participating

RAO, Judge: Plaintiff herein challenges the action of the collector of customs in classifying certain imported printing paper within the provisions of paragraph 1401 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, for uncoated printing paper, not specially provided for, and assessing duty thereon at the rate of one-fifth of 1 cent per pound and 5 per centum ad valorem. The claim is made that said paper is standard newsprint paper, which is entitled to entry without the payment of duty, by reason of the provisions of paragraph 1772 of said act.

There is no dispute here concerning the basis of the collector's action. It is virtually conceded by the parties that, in all respects except sizing, the instant paper conforms to the specifications for standard newsprint paper, as promulgated by the Secretary of the Treasury in T. D. 40996 (47 Treas. Dec. 844), and as known to trade and commerce as of the date of the passage of the present tariff statute. Free entry was denied this importation by reason of the fact that it contained an excessive amount of sizing.

Tests by the United States Customs Laboratory, using the so-called ground-glass method, indicate that more than 10 seconds were required for water to penetrate representative samples. This finding is not controverted. Plaintiff claims, however, that sizing is not a determining factor in the consideration of what is standard newsprint paper and that the paper at bar belongs to that class of paper which,

at and prior to June 17, 1930, was chiefly used for the printing of newspapers.

Counsel for the Government contends that the presence of sizing to the extent shown here to exist excludes the instant paper from that class or kind of paper chiefly used for the printing of newspapers in 1930, despite the fact that, in all other respects, it admittedly conforms to the specifications for standard newsprint paper.

It is by now well-settled law that the classification of printing paper as standard newsprint paper is dependent upon its being paper of the class or kind which was chiefly used for the printing of newspapers at and prior to the time the present tariff act became a law. Susceptibility for use in printing newspapers is not the test; nor is the fact that the paper at bar was actually used for printing newspapers determinative of its classification. *Crown Willamette Paper Co.* v. *United States*, 16 Ct. Cust. Appls. 431, T. D. 43187; *United States* v. *James P. Heffernan Paper Co.*, 17 C. C. P. A. (Customs) 61, T. D. 43358; *United States* v. *F. W. Myers & Co. Inc.*, 24 C. C. P. A. (Customs) 464, T. D. 48913; *United States* v. *C. J. Tower & Sons*, 26 C. C. P. A. (Customs) 1, T. D. 49534; *Malmar Paper Co. et al.* v. *United States*, 27 Cust. Ct. 16, C. D. 1341; *Democrat-Herald Publishing Co. and Geo. S. Bush & Co. Inc.* v. *United States*, 29 Cust. Ct. 431, Abstract 57000. Standards prescribed by the Secretary of the Treasury may properly be invoked by the collector as a guide in classifying importations of printing paper, but may not be made to serve as a bar to the free entry of any such paper falling within the types chiefly used for the printing of newspapers at or prior to June 17, 1930. *United States* v. *James P. Heffernan Paper Co., supra.* The question of what classes of paper were so used at that time, and whether the particular paper involved in any controversy is of that class, are issues of fact which must be established by competent evidence. *The Tribune Publishing Company* v. *United States*, 35 Cust. Ct. 104, C. D. 1729.

It appearing that the paper at bar meets all the specifications for standard newsprint paper, except as to sizing, we are now required to determine from the evidence before us whether sizing would have affected its status as a member of that class of papers. The issue is not a new one. It was raised identically in the case of *Democrat-Herald Publishing Co. and Geo S. Bush & Co., Inc.* v. *United States, supra*, and resolved in favor of the importer.

Predicated upon the testimony of witness A. George Lutz, that the paper here involved was essentially the same as that the subject of decision in said case, the record as therein made was received in evidence as part of the record in the present case. For all material purposes, it serves as the instant plaintiff's entire proof.

In the decided case, we reviewed in detail the testimony of plaintiff's four substantive witnesses, no evidence having been introduced

by the defendant. They were Ralph R. Cronise, for 32 years publisher of the Albany [Oregon] Democrat-Herald, a daily newspaper, who had been engaged in newspaper work for more than 40 years; Ralph R. Dickey, northwest sales manager of Crown Willamette Paper Co., who was employed by that company in various capacities for 43 years, having sold paper of all kinds, including newsprint, in the 11 states west of Denver for 33 years; Edward H. Munn, technical supervisor for the Crown Zellerbach Corp., by whom he had been employed since 1930, having been, for the period from March to September 1930, a chemist in the company's laboratory at West Linn, Oreg., testing paper, including newsprint paper; and A. George Lutz, a paper merchant since 1911, who stated that he had dealt in a general line of paper "all the way from newsprint and wrapping papers" and had sold paper everywhere east of the Rockies.

Summarizing their combined testimony, we stated:

Running through the testimony of all of these witnesses is the affirmative assertion that sizing is not now, and was not in 1930, a determinative characteristic of standard newsprint paper. Paper which met certain other standards as to strength, surface smoothness, ink receptivity, fiber quality, brightness, width, thickness, weight, and dirt content, and was chiefly used for the printing of newspapers was considered to be standard newsprint paper in 1930. But whether it had a small or a fair amount of sizing or whether the degree of sizing was one that might be termed excessive was not an item which entered into commercial understanding of what was then considered standard newsprint paper.

Furthermore, each of these witnesses, whose experiences covered the newspaper publishing, the chemical, the production, distribution, and the selling aspects of standard newsprint paper at and prior to June 17, 1930, was of the opinion that irrespective of the degree of sizing in plaintiff's collective exhibit 1 it was standard newsprint paper, as that paper was known when the Tariff Act of 1930 became a law.

In view of the concession here that in all respects, except sizing, the paper at bar was of the class of paper known in 1930 as standard newsprint, and of the testimony that the degree of sizing in paper neither affected its utility in the printing of newspapers nor entered into the commercial understanding of what was standard newsprint paper, and there being no evidence to controvert the testimony offered in this respect, we are constrained to hold that plaintiffs have sustained the burden of proving that the importation at bar falls within the class of paper which at and prior to June 17, 1930, was chiefly used for the printing of newspapers. The claim that the instant merchandise is free of duty as standard newsprint paper which is provided for in paragraph 1772 of the Tariff Act of 1930 is therefore sustained.

The present record offers on the part of the plaintiff the collector's reason for his assessment of duty upon the instant merchandise—the fact that the chemist's report (plaintiff's exhibit 1) states "Penetration of water (ground glass method) requires more than 10 seconds," indicating excessive sizing—a sample of the imported paper (plaintiff's exhibit 2), and further evidence from witness Lutz.

The latter reiterated that he is a paper mill representative and paper merchant, who has been in the paper business since 1911, handling a cross-section of different kinds of paper, including standard newsprint paper. He stated that he has bought and sold groundwood papers, papers free from ground wood, tissue paper, wrapping papers, and standard newsprint paper, his sales extending "all the way from Boston out to St. Louis, Kansas City, Chicago, down to the east coast," and has also operated some paper mills. His sales have been mostly from paper mills directly to paper merchants, exporters, and paper converters. With particular reference to standard newsprint paper, his activities involved its purchase and sale on and prior to June 17, 1930. He sold newsprint in and around New York, Boston, New England, and Pennsylvania, in addition to which he believed that, prior to 1930, he sold some to Western Newspaper Union, which has offices throughout Kansas City. As to other sales of newsprint to the Butler Paper Corp. of Chicago and the Sierra Paper Co. in California, the witness could not recall the dates.

Lutz stated further that he has seen standard newsprint paper manufactured in different mills since 1915, and possibly before, and thought that he, himself, had manufactured newsprint at one time or another. He also sold paper for a paper mill in Skowhegan, Maine, which manufactured newsprint, although the dates of any such sales are not given.

This witness compared plaintiff's exhibit 2, with exhibits 1 and 3 in the incorporated case, and found them to be of about the same strength, formation, weight, thickness, substance, and sizing. To determine whether the papers had been sized, he made a so-called tongue test for moisture penetration. He found that exhibit 2 has a better color than the other exhibits, due possibly to the fact that the latter had tarnished with age. It was the opinion of this witness, based upon his experience, that all of the samples were definitely newsprint paper, positively adapted for newsprint purposes.

Cross-examination of this witness revealed that, for the period between 1918 and 1930, he sold about 2,000 tons of standard newsprint, of which his testimony at the first trial shows one sale of 500 tons in the years between 1918 and 1920, to the Empire Card & Paper Co., who was a paper jobber. His prior testimony also indicates that standard newsprint represented a small percentage of his overall business.

Lutz testified further, on cross-examination, that the tongue test showed that the moisture penetrated quite fast and that this fact has a bearing on whether or not the paper is standard newsprint paper. If it were hard sized, it might be used for purposes other than standard newsprint, such as lining of boxes and for other kinds of work. When

asked if he had not previously testified that sizing is an immaterial factor, the witness stated:

Well, in standard newsprint paper the technique might vary in some mills. Some mills might, knowing that a newspaper might be printed at slow speed, they might put a little more sizing in their paper because if the newsprint runs slower it might absorb the ink faster. So that the technique might vary in various mills. Some mills might leave out sizing, some mills might put a little sizing in it to give it a little better quality, to give a better quality to the paper.

He thought that mills generally add a little sizing, in any event, otherwise the paper would be "nothing but blotting paper."

For the defendant, the first witness called was Frederick W. Mears, assistant manager of sales for newsprint of the Great Northern Paper Co. He stated that he went with that company as an apprentice in 1916 to learn the business. He was thereafter, successively, foreman at the groundwood mill at Millinocket, assistant superintendent of the company's East Millinocket mill, assistant superintendent at Millinocket, superintendent of the Madison, Maine, mill, was transferred to sales in 1929, and was appointed to his present position in 1938.

Mears testified that his company sold between 250 and 300 thousand tons of standard newsprint paper in 1929 and 1930 and was probably the largest producer of such paper in the United States at that time. Sales were made to some 200 newspapers throughout the East, as far south as Montgomery, Ala., with one small account in Bradenton, Fla., and as far west as the Mississippi River. As a result of his personal experience within the area mentioned, this witness stated that he was familiar with the trade understanding of the term, standard newsprint paper, which referred to paper of a base weight of 32 pounds for 500 sheets, 24 by 36, with a caliper of between 3 and 4 points, an ash content of not over 6 per centum, a roll width of 15 inches, which was not sized. No paper sold by his company, at or prior to June 1930, as standard newsprint was sized. If it were sized, even though standard in all other respects, it would not be standard newsprint paper, nor belong to a class of paper chiefly used for the printing of newspapers. Generally speaking, it would be quite an uncommon grade, usable for board or box lining or for school purposes. On a small scale, a mill could size paper without special equipment. In a large mill, it requires emulsifying tanks, alum tanks, pumps, and a great deal of piping to size paper.

On cross-examination, Mears reiterated that if there is any kind of sizing in paper, it is not standard newsprint, and that his company does not size its standard newsprint. He has examined papers made by others and not found any sizing, although he made no specific test therefor, for such a test would be immaterial. "You don't test for something that's not there." However, he does apply the tongue

test to about every sheet of newsprint that he sees. It was the opinion of this witness that in standard newsprint there should be practically instantaneous penetration, taking not more than a few seconds. He has heard of various methods for testing for sizing, but stated his company does not make such tests because it does not use sizing. As all manufacturers compete quality wise, there is no occasion to make these tests. Upon making the tongue test of exhibit 3 in the incorporated case, Mears found it to be "very definitely sized," although not hard sized. He stated that if it were standard newsprint the moisture from his tongue would go right through the sheet. This did not happen with the sample tested. It showed a resistance to moisture penetration, which indicated to him that the paper was sized. Exhibits 1, in the prior case, and 2, in the instant one, also showed sizing, when subjected to the tongue test.

According to this witness, orders for standard newsprint specify the basic weight and width and, once in a great while, the ash content. Nothing is said about sizing, but sizing is, nevertheless, a factor in determining what is standard newsprint paper. Although superficially these exhibits look like standard newsprint, they are not standard newsprint because they are sized.

Frank L. A. Carter, also called by defendant, testified that he is presently in the sales department of the St. Croix Paper Co. From 1920 to January 1, 1954, he was with the H. G. Craig Co., a firm which acted as sales representative for various paper mills, and, as of 1930, sold standard newsprint to various newspapers as far south as Baltimore and as far west as Cincinnati and Indianapolis, in quantities in excess of 100,000 tons a year.

Carter started as a clerk with the H. G. Craig Co. He was also in the billing and auditing department, where he checked invoices from the mills, and eventually became vice president of the company. For the 3 years immediately prior to June 17, 1930, he was chief clerk and traffic manager, whose duties consisted of checking every contract his company prepared for the publishers, as well as invoices received from the various mills. Attached to each invoice were two samples of the type of paper ordered, and it was Carter's duty to test these samples. He has also seen newsprint run in the press rooms, in the New York area, and at sidings when it comes from the mills and has spent some time in various newsprint mills. His definition of newsprint, based upon his experience, was paper in rolls, of a basic weight of 32 pounds for 500 sheets, 24 by 36, varying in diameter according to the size of the paper, of a finish of about 70 per centum groundwood pulp and unbleached sulphite, generally white in color. "As far as I know, and I have been to quite a few mills, I have never seen any sizing operation in a standard newsprint mill." It is not supposed to contain sizing, and no paper sold by his company, at and

prior to June 17, 1930, ever contained any sizing. According to this witness, "If it were a standard newsprint paper that contained size it would be classified as either hard-size news or a size sheet."

Carter made the tongue test with plaintiff's exhibit 2 and stated that it was sized, although he could not tell if it were hard sized. He stated:

I have placed this piece of paper, Exhibit 2, against my tongue and applied moisture from my tongue. In a sheet of standard newsprint the moisture from my tongue would penetrate to the other side of the sheet in a matter of a few seconds. This particular sheet I do not see any moisture penetrating even now, so I would say that this sheet contains sizing.

Since it contains sizing, it would be useful in the boxboard trade for lining boxes, as hard-size news lining. It could be used for newsprint in an emergency, but, based upon his experience, the presence of sizing would exclude it from that class of papers chiefly used for printing newspapers at or immediately prior to June 17, 1930.

On cross-examination, Carter stated that, according to both trade and manufacturing terms, newsprint does not contain any sizing. If it did, it would not be classified as standard newsprint. He, too, is familiar with the various tests for determining sizing but has never seen any equipment of that sort in any standard newsprint mill he has ever visited as far back as 1920. The reason sizing is not used in standard newsprint is that the ink must be absorbed by the sheet. If there is sizing, the ink would not penetrate. Ink is made to conform with standard newsprint in such a way, and of such a texture, that it does not penetrate through to the other side. With the possible exception of color, there is very little difference in the formation, caliper, or finish of newsprint produced by various mills. This witness stated that sizing is not mentioned either in invoices or contracts for standard newsprint; that standard newsprint paper contains no sizing whatsoever; and that he never heard of any newsprint made in any mill in this country that contains any sizing. Although exhibits 1 and 2 have the characteristics of newsprint paper, they are not standard newsprint because they contain sizing. "As long as it has any sizing whatsoever I do not classify it as standard newsprint."

At the close of the trial, the parties stipulated that the subject paper was used by the Oregonian of Portland, Oreg., a newspaper, in its regular presses for its regular daily editions.

As heretofore noted, our conclusion in the incorporated case rested upon uncontroverted proof which established *prima facie* that sizing was not a determining characteristic of standard newsprint and that the presence of sizing, even to a degree that might be termed excessive, did not operate to exclude from the class of papers chiefly used for the printing of newspapers, at and prior to June 17, 1930, paper which

in all other respects was conceded to be standard newsprint. A very different situation confronts us now.

Two witnesses, who by reason of extensive experience in the purchase and sale of standard newsprint, the volume of business transacted, and the geographical areas to which their sales extended, were eminently qualified to testify upon this issue, have here stated unequivocally that paper, standard in all respects save that of sizing, such as the print paper at bar, did not belong to that category of papers chiefly used in the printing of newspapers either in 1930, or at the present time. It was their considered opinion that standard newsprint is not sized and that sizing would adversely affect a newspaper use by retarding ink absorption. Both witnesses agreed that paper which conformed to all of the specifications for standard newsprint, but was also sized, would have been useful for lining boxes, not for printing newspapers, except perhaps in an emergency.

While their sales may not be said to extend throughout the United States, they, nevertheless, represented a substantial section of the country. In the areas in which they sold, print paper which was sized was not of the class chiefly used by newspapers. If this be so, chief use has been negatived with respect to all that part of the United States which lies east of the Mississippi River. It is obvious that proof of exclusion from a class, insofar as chief use is concerned, does not require the same degree of generality as proof of inclusion within the class, in the absence of evidence showing use within a restricted area, only.

Moreover, whereas witness Lutz originally testified that if it takes more than 10 seconds for water to penetrate paper, the sizing would be excessive, but, nevertheless, such paper would still be standard newsprint, and, while continuing to assert that the paper at bar is standard newsprint, he now admits that the time of moisture penetration does have a bearing upon whether or not paper is standard newsprint paper "because if the paper were sized, what we call hard sized, it might be used for purposes other than standard newsprint paper such as lining of boxes, box lining, or for other kinds of work."

Further, with regard to plaintiff's witness Lutz, it is now clearly made to appear that his experience with standard newsprint paper, at and prior to June 17, 1930, was of a very limited nature. For the entire period from 1918 to 1930, his total transactions with this class of merchandise consisted of the sale of possibly 2,000 tons. When this is contrasted with the combined 350 to 400 thousand ton sales of the two companies with which defendant's witnesses were respectively affiliated, it is dwarfed into veritable insignificance.

The effect of the testimony of plaintiff's witness Dickey is also now materially weakened, when it is considered that he gave no evidence of the quantity of standard newsprint sold by his company in the

Pacific coast area during the time here pertinent, or the relative position in his company's overall production of papers which standard newsprint paper occupied.

We are of opinion that the weight of the evidence in the instant case preponderates in favor of the defendant and that it has been here established that paper which has been sized was, at and prior to June 17, 1930, excluded from the class of papers chiefly used for printing newspapers.

It is argued by counsel for the plaintiff that the statement of defendant's two witnesses to the effect that paper having any sizing is not standard newsprint "is a most startling pronouncement," for the reason that the Secretary of the Treasury has, in T. D. 40996, *supra*, recognized the presence of sizing in standard newsprint by providing elaborate tests for determining the degree thereof to be found in samples of paper submitted for analysis. As pointed out by *amicus curiae*, however, "10 seconds is really a very short period of time." What the Secretary of the Treasury has done is to establish a maximum, not a minimum, permissible presence of sizing, very much in the nature of a tolerance. This is not tantamount to an expression that standard newsprint paper is, or must be, sized. It is rather a concession that standard newsprint paper may continue to be regarded as such, though it contains some sizing, if transudation of water does not consume more than 10 seconds by the ground-glass method, nor 5 seconds by any alternative method.

In any event, what is or is not standard newsprint paper is a question to be determined from facts which are required to be proved, rather than from specifications promulgated by the Treasury Department. Plaintiff having failed to sustain its burden of proof in this respect, its claim for free entry of the instant printing paper as standard newsprint paper is overruled.

Judgment will be entered accordingly.