BEFORE THE SECOND DIVISION, NOVEMBER 17, 1958

**No. 62454.**—R. W. Smith *v.* United States, protest 185685-K (Galveston).

RAO, Judge:   Certain imported merchandise was assessed with duty at the rate of one-fifth of 1 cent per pound and 5 per centum ad valorem, as uncoated printing paper, pursuant to the provisions of paragraph 1401 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.   Plaintiff contends that the involved paper is entitled to free entry as standard newsprint paper, as provided for in paragraph 1772 of said act.

The respective tariff provisions read as follows:

Paragraph 1401, as modified by T. D. 51802, *supra*:

Uncoated papers commonly or commercially known as book paper, and all uncoated printing paper, not specially provided for, not including cover paper_____ ⅕¢ per lb. and 5% ad val.

Paragraph 1772:

Standard newsprint paper.

There is no issue of law in this case.   The question which has been presented for decision is solely one of fact arising from a dispute as to the thickness of the subject paper at the time of importation.   It is otherwise agreed that in all other respects the subject paper conforms to the legal definition of standard newsprint paper, both as prescribed by the Treasury Department and as judicially proclaimed.   In other words, it may be here assumed that but for its thickness this paper is of a class or kind of paper which was chiefly used for the printing of newspaper at and prior to the date the Tariff Act of 1930 became a law, which is the criterion for determining whether printing paper is standard newsprint paper. *Geo. S. Bush & Co., Inc.* v. *United States*, 37 Cust. Ct. 45, C. D. 1797.

In respect of the matter of thickness, for the purposes of this case, the Treasury Department's specification that the thickness of standard newsprint paper shall not be in excess of 0.004 of an inch, plus a tolerance of 5 per centum, the maximum allowable being therefor 0.0042 of an inch, has been accepted as properly determi-

native. (47 Treas. Dec. 844, T. D. 40996, as amended by 58 Treas. Dec. 413, T. D. 44317, and 61 Treas. Dec. 165, T. D. 45418 (4).)

It appears from the record, in this case, that the instant paper was shipped by sea from Quebec, Canada, on November 20, 1950. It arrived at the port of Houston, Tex., on December 11, 1950, and was entered for consumption on December 13, 1950. On the following day, several samples were taken from the shipment.[1] Thereafter, they were placed in a manila envelope and forwarded to the customs laboratory at New Orleans for analysis. The samples arrived in New Orleans on December 20, 1950, and were apparently examined on January 11, 1951. The chemist's report thereon, which is in evidence as defendant's exhibit A, reads as follows:

This sample conforms to the requirements for standard newsprint paper (dimensions of sheets or rolls not included).

Except in the following respect—average thickness 0.0044 in.

T. D. 40996 and amendments have been noted.

A subsequent examination of additional samples furnished by the importer upon the request of the customs officials also showed the average thickness to be 0.0044 (defendant's exhibit B).

Primarily, it is plaintiff's contention that the samples so tested did not accurately reflect the thickness of the paper at the time of importation, for the reason that, due to conditions of high relative humidity prevailing in both Houston and New Orleans, between the date of entry and the time of examination, the paper tested had acquired its excessive thickness through absorption of moisture after importation, and that the results obtained by the chemist were not typical of the bulk of the newsprint.

Weather conditions prevailing in Houston and New Orleans for the months of December 1950 and January 1951 were established through the medium of official weather reports (plaintiff's collective exhibits 1 and 2) and the testimony of a meteorologist connected with the United States Weather Bureau at Houston. It appears therefrom that these months were periods of high relative humidity, marked by frequent and preponderating occurrences of humidity readings between 90 and 100 percent.

Milo B. Strain, the chief chemist of the United States Customs Laboratory at New Orleans, testifying on behalf of plaintiff, admitted that conditions of particularly damp weather could account for an increase in thickness of paper over the allowable tolerance, where the paper was not sealed in an airtight container and was not examined for 21 days or more after importation. However, he did not observe any evidence of moisture on the paper he received and was of opinion that the heavy wrapping paper in which it was sent was "virtually waterproof from the standpoint of protecting the paper itself." He also stated that where paper increases in thickness as the result of dampness, it does not return to its previous state upon becoming dry.

The record contains no direct evidence of the thickness of the paper at bar on the date of importation. However, four witnesses whose testimony was taken pursuant to a duly issued commission, gave evidence relating to the circumstances under which the paper was produced, and its condition at the time of shipment. They were Frederick Henry Harding, supervisor of routine pulp and paper testing for Anglo Canadian Pulp and Paper Mills, Ltd., the manufacturer of the instant paper; John Louis Alexander Corcoran, general mill superintendent of the com-

---

[1] Presumptively, these samples were taken in the manner prescribed in T. D. 45418 (4), *supra*, i. e., from the outer layers of the rolls.

pany, in full charge of all paper turned out by the mill, with 42 years' experience in the manufacture of newsprint; Patrick Sarsfield Quinn, acting purchasing agent of the company, at the time of manufacture of the subject paper, and presently mill manager; and Dr. Kenneth Calvin Logan, a doctor of philosophy in cellulose and industrial chemistry, in charge of the research and development work of Anglo Canadian Pulp and Paper Mills, Ltd.

It appears therefrom that Anglo Canadian Pulp and Paper Mills, Ltd., is a company engaged exclusively in the manufacture of newsprint paper, the greater proportion of which is exported to the United States. In the course of production of newsprint, routine quality tests are made at least 6 times every 8 hours, or a total of 18 tests per 24-hour day, to determine thickness, basis weight, mullen, tear, smoothness, and brightness. Thickness tests "consist of taking a given number of newsprint sheets and using an automatic micrometer, placing the sheets between the two faces of said micrometer which exerts a pressure of approximately seven to nine pounds on said sheets. The dial reading divided by the number of sheets will give the thickness of one sheet."

None of these witnesses could recall any instance of standard newsprint paper manufactured by Anglo Canadian Pulp and Paper Mills, Ltd., which tested in excess of 0.00385 of an inch in thickness, the average of the mill's production being 0.00345 of an inch. Although the actual test records of the shipment at bar were destroyed in a flood, available records indicated that the average thickness for that shipment was 0.00346.

As a result of special tests and/or personal knowledge, these witnesses were of opinion that relative humidity has a tendency to increase the thickness of newsprint, and, where the percentage of humidity is 95 or over, an increase in thickness of as much as 50 percent could occur. However, due to the tightness of a roll of newsprint, and the protection afforded the inner layers by the paper itself, as well as the outer wrapping of the rolls, the effect of exposure to dampness—an increase in thickness—would not penetrate beyond a half inch. Consequently, samples taken from the 10 outer layers of a roll of newsprint which were exposed to atmospheric conditions, wherein the relative humidity had reached 100 percent on several occasions prior to testing, would not be representative of the thickness of the newsprint throughout the roll. Ordinary wrapping paper offers relatively little protection against the absorption of moisture, and paper so covered, and exposed to high humidity, would have increased in thickness to a very great extent.

It was the opinion of both Corcoran and Logan that it would not be possible for newsprint paper testing 0.0035 of an inch at the time of its manufacture to increase to 0.0044 of an inch on a voyage from Quebec, Canada, to Houston, Tex. The outer layers of the newsprint and the wrapping of the rolls would prevent it. Moreover, if such an increase occurred, as stated by Logan:

The rolls would burst open and tear at the ends and along its length. These rolls would be entirely unsuited for use in the press rooms of the publishers.

\* \* \* \* \* \* \*

\* \* \* Such damage would be clearly noted by the shipping agent, by men unloading the paper, by the carrier from the port to the customer and finally by the customer himself. No remarks of such damage were reported. Even if the paper had swollen to this extent it would be completely useless to the customer and could only be used as waste paper or as a pulp substitute.

The evidence in behalf of plaintiff, which has not been controverted, convinces the court that the bulk of the paper at bar measured less than 0.0042 of an inch in thickness at the time of importation, and that the samples tested in the Govern-

ment laboratory 31 days after arrival at the port of Houston, Tex., had acquired their excess measurement as the result of the highly humid atmospheric conditions prevailing both at the port of entry and at the place of analysis. It has been sufficiently established that, at the time of shipment, the instant importation had an average thickness of 0.00346 of an inch per sheet. Well-qualified witnesses have expressed the opinion that the effects of moisture in the air would not be felt deeper than one-half inch from the surface of a roll of newsprint, by reason of the protection provided by the outer layers of the paper itself, and the outside wrapping of the roll. The stated effect of an increase in thickness to the extent revealed by the analysis, as compared with the average thickness at the time of exportation—a bursting of the rolls and a tearing of the paper—comports with our judicial knowledge of physical facts, and it is both reasonable and logical to assume that had such damage occurred, a complaint of some kind would have been registered. These are compelling considerations for reaching the conclusion that the laboratory analysis of the instant merchandise did not truly reflect its condition at the time of importation, and that it did, in fact, then conform to every specification for standard newsprint paper, thickness included.

Counsel for the Government has urged the court to reconsider and reverse the action of the trial judge, on circuit, in overruling various objections to the testimony of the four witnesses whose depositions were read into the record. The right of a division of the court to pass upon such matters is, by now, well settled. *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 22 Cust. Ct. 158, C. D. 1175, and cases cited therein. Without detailing the specific nature of those objections, it is sufficient for us to observe that we have carefully reviewed the rulings thereon, and are in agreement therewith.

Based upon the foregoing considerations, we find and hold that the claim of the plaintiff for free entry of the instant merchandise as standard newsprint paper within the provisions of paragraph 1772 of the Tariff Act of 1930 is well founded. It is, therefore, sustained.

Judgment will be entered accordingly.